Diane Kristen MELING, Debtor.

Diane Kristen Meling, Plaintiff,

v.

**United States of America, Department of Education et al., Defendants.**

Bankruptcy No. 99–03008–W.
Adversary No. 00–9004–W.

United States Bankruptcy Court,
N.D. Iowa.

April 9, 2001.

Michael C. Dunbar, Waterloo, IA, for debtor.

## ORDER RE DEBTOR'S COMPLAINT TO DETERMINE DISCHARGE-ABILITY OF DEBT

PAUL J. KILBURG, Chief Judge.

On March 7, 2001, the above-captioned matter came on for hearing on Debtor's Complaint to Determine Dischargeability of Debt. Debtor/Plaintiff Diane Kristin Meling appeared with her attorney Michael Dunbar. Assistant United States Attorney Larry Kudej and Legal Intern Matthew James appeared for Defendant U.S. Department of Education. The time for filing briefs has now passed and the matter is ready for resolution. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

## STATEMENT OF THE CASE

As a preliminary matter, it is noted that Cylinder State Bank, Waldorf College, University of Northern Iowa, Iowa College Student Aid Corporation and Iowa Student Loan Liquidity Corporation, the other Defendants named in the amended complaint, failed to file responsive pleadings. From the Certificate of Service, it does not appear that Cylinder State Bank was properly served. Since proper service is not shown, this decision does not affect the disposition of any student loan held by Cylinder State Bank. However, it appears that the remaining defendants were properly served. Therefore, this opinion is binding on the Department of Education as well as all remaining defendants, who failed to file answers except for Cylinder State Bank.

## STATEMENT OF FACTS

Debtor Diane Meling seeks an undue hardship discharge of her student loan obligations. She is 28 years old and single with no dependants. She has a long and well documented history of mental illness. At the age of 17, while a junior in high school in Spencer, Iowa, she was hospitalized for several weeks because of extreme depression. Debtor was subsequently diagnosed as having bipolar disorder. This is in common parlance referred to as manic depression.

Bipolar disorder is a chronic mental health disorder that is genetic in nature. Symptoms usually first appear in early adulthood and typically resurface throughout the person's lifetime. A person with bipolar disorder experiences dramatic swings in mood and behavior. During the

depressed phase, the individual can have extreme feelings of low self worth and typically becomes detached from society. Conversely, during the manic phase of the illness, the individual experiences very poor judgment and has a tendency to become delusional as well as paranoid. The illness can be treated with medication. Such treatment, however, cannot always prevent a person from cycling into a manic or depressive phase.

The severity of the illness varies from person to person. Some patients with bipolar disorder live long, normal, and healthy lives with proper medication and psychiatric supervision, while others face constant bouts of illness and hospitalization. Bipolar disorder does not abate with time and the degree of illness typically remains constant throughout the person's lifetime. Debtor's prognosis is not the most favorable. She was hospitalized several times in early adulthood, takes three medications daily, and regularly sees a psychiatrist. Debtor's psychiatrist, Dr. Mary Sergento, stated that Debtor has trouble controlling her emotions even when she is not in a manic or depressive phase of her illness.

In the fall of 1991, after graduating from high school, Debtor attended Waldorf College, located in Forest City, Iowa, to pursue her aspiration of becoming a teacher. At the time, Debtor maintained a belief that her illness would not prevent her from realizing her goal. However, after one semester at Waldorf, she found that she could not successfully tolerate the stress involved with her education and was hospitalized for depression. She underwent electric shock treatment in an effort to stabilize her illness. She was forced to withdraw from her spring semester courses due to her prolonged hospitalization. Despite the treatment, Debtor withdrew from Waldorf in the fall of 1992.

During the fall of 1992, Debtor went to work and was eventually fired from several jobs. She testified that the positions, especially one at a local nursing home, made her overly tired. She could not keep pace with the demands of the work. In an effort to ease back into her education, Debtor enrolled in a computer class at Iowa Lakes Community College located in Emmetsburg, Iowa, in the spring of 1993.

After gaining significant course credit at Iowa Lakes, Debtor enrolled at the University of Northern Iowa in the spring of 1994. At that time, she elected to stop taking her medication. Not surprisingly, at the end of her fall semester at U.N.I., Debtor experienced another bout of extreme depression and was hospitalized and forced back onto medication. Once again, Debtor was compelled to withdraw from her courses due to her illness. Since Debtor experienced a high level of stress at the university level, she did not return to U.N.I. but chose to withdraw from classes and went back to Iowa Lakes to take classes part-time.

In the summer of 1996, Debtor enrolled at Hawkeye Community College in Waterloo, Iowa. Debtor found it easier to work part-time and attend school part-time. From 1994 to 1998, she attempted to work at several jobs, all of which paid near minimum wage, but found each one too stressful and demanding. Consequently, she never held a job longer than a few months.

Eventually, Debtor obtained her Associate of Arts degree from Hawkeye Community College. In the fall of 1998, believing she was prepared to take on the stress of big campus life, Debtor again enrolled at U.N.I. She planned to become a social worker and scheduled classes accordingly. Balancing part-time school with part-time work, Debtor managed to receive decent

grades during her first two semesters back at U.N.I.

Despite making significant progress at U.N.I., Debtor faced troubles outside of the classroom. While there, Debtor dated a man who she claims was manipulating her. Although most of her educational expenses were covered by grants due to her disability, Debtor's boyfriend allegedly coerced her into taking out student loans in her name to help him meet his own personal expenses and to pay off his own student loan obligations. Debtor also alleges that he is the reason that she faced growing credit card debt which, in turn, forced her to consider bankruptcy.

In the fall of 1999, Debtor states that she came to the realization that her boyfriend did not have her best interests at heart. She terminated their relationship but the damage had been done. Stress began to mount once more and as finals approached, Debtor was hospitalized for depression.

On November 15, 1999, Debtor filed for relief under Chapter 7. In her Answers to Interrogatories, Debtor states that the main reason for filing was to discharge her credit card debt, not her recently acquired student loan debt. However, after consultation with her attorney and her doctors, Debtor determined that discharge of her student loan debt may be a viable option.

Debtor's psychiatrist contends that Debtor will never be able to work more than part-time at a low-stress job. She will probably have to rely on Social Security benefits for the rest of her life. The hours she works must be flexible and she must have an employer who is tolerant of Debtor's needs and abilities. Fortunately, Debtor has recently received employment through a woman who belongs to Debtor's church. Debtor now works part-time at the Shirt Farm in Spencer, Iowa. The stress level at her workplace is relatively low and Debtor has managed to move out of her parents' house. Although she is living in an apartment by herself, she is not without supervision. The apartment building is run by the Sunshine Group, an organization that supervises mentally handicapped and mentally ill people.

At trial, Debtor stated she never intends to attend college again because the stress level has proven to be far too much for her to handle. Since beginning her new job and moving out of her parents' house, Debtor's illness has stabilized. However, any reasonable hope for greater prospects does not exist.

In her schedules, Debtor lists a total net monthly income of $991.00, half of which is Social Security income. Her monthly expenses total $1,172.00. Debtor's expenses rose after her bankruptcy filing because of her recent choice to move out of her parent's home.

In Debtor's Complaint, she lists the following student loan obligations owed to each creditor: Waldorf College from 1991 for $1,000.00, Cylinder State Bank from 1994 for $3,354.00, University of Northern Iowa from 1994 and 1996 for $3,695.00 and $5,500.00 respectively, and the U.S. Department of Education from 1998 and 1999 for $22,560.00. Also, Iowa Student Loan Liquidity Corp. and Iowa Student Aid Commission are listed in the complaint as entities attempting to collect on a student loan debt.

### DISCUSSION

■ Unless a debtor proves the "undue hardship" exception provided for in 11 U.S.C. § 523(a)(8) applies, student loan obligations are not dischargeable in bankruptcy. *In re Scholl*, 259 B.R. 345, 347–48 (Bankr.N.D.Iowa 2001). The Eighth Circuit has adopted a "totality of the circumstances" test in determining whether un-

due hardship exists. *In re Andresen,* 232 B.R. 127, 137 (8th Cir. BAP 1999); *In re Cline,* 248 B.R. 347, 349 (8th Cir. BAP 2000). To apply the test, the Court must focus on the debtor's current and future financial resources, necessary reasonable living expenses for the debtor and the debtor's dependents, and any other facts unique to the particular bankruptcy case. *Cline,* 248 B.R. at 349.

■ The test is open-ended and the Court has broad latitude to consider any evidence that is relevant to the debtor's situation. *Andresen,* 232 B.R. at 140. One court has set out a list of factors that may be relevant to certain situations. *In re Morgan,* 247 B.R. 776, 782 (Bankr. E.D.Ark.2000) (listing nine factors). This list is non-exhaustive and the test must be applied on a case by case basis. *See Scholl,* at 348–49.

■ To establish undue hardship, the Court must be satisfied that repayment of the student loan is "hopeless." *In re Roberson,* 999 F.2d 1132, 1135 (7th Cir.1993). Mere "garden variety" hardship will not suffice. *In re Mathews,* 166 B.R. 940, 943 (Bankr.D.Kan.1994).

Debtor has established that her current monthly income is $991. Debtor is virtually devoid of any marketable job skills and it is highly unlikely that her prospects for a higher paying job will improve anytime in the future. It is reasonable to conclude that she will never be able to work more than part-time due to her illness and will always require Social Security assistance. Furthermore, there is no showing that she is likely to receive any financial windfall in the future.

■ The Department of Education disputed several listed expenses as being excessive. In particular, it claimed that a $100 monthly tithe to Debtor's church was unreasonable. Several courts have ad-dressed the issue of tithing in the undue hardship context and found that such donations are per se unreasonable. *See In re Ritchie,* 254 B.R. 913, 919 (Bankr.D.Idaho 2000) (holding charitable donations are excluded as proper expense); *In re McLeroy,* 250 B.R. 872, 880 (N.D.Tex. 2000). This Court rejects the per se rule established in that line of cases. In *Cline,* 248 B.R. at 349, the Bankruptcy Appellate Panel for the Eighth Circuit, while reviewing an undue hardship appeal, upheld the lower court finding that a $25 monthly tithing was "modest and reasonable under the circumstances."

In the instant case, Debtor is employed by a fellow church member who understands the impact that Debtor's illness has on her ability to work. But for this contact Debtor could be in a worse financial position. Although the tithing to her church did not begin until after bankruptcy was filed, the Court finds that Debtor is a deeply religious person and such a contribution is reasonable under the circumstances. As to the remaining disputed expenses, the Court finds that Debtor's listed living expenses are necessary and reasonable.

■ Considering the additional facts and circumstances unique to Debtor's situation, the Court finds a number of factors necessitate a finding of undue hardship. Debtor is hampered with a serious mental illness. Her condition is likely to persist throughout her entire lifetime. Although this Court agrees that bipolar disorder standing by itself is insufficient for a finding of undue hardship, Debtor has demonstrated that her condition is severely debilitating. *In re Plotkin,* 164 B.R. 623, 624 (Bankr.W.D.Ark.1994). Debtor does not face mere financial difficulty; rather, her disorder prevents her from entering the workforce with any marketable skills or abilities.

This Court also finds that Debtor has presented credible evidence and has acted with the requisite amount of good faith. Normally, student loan debtors must at least attempt to repay the loans before seeking an "undue hardship" discharge. However, this case is exceptional due to the severity of Debtor's illness. Further, the Court is convinced that Debtor's poor judgment in acquiring the most recent loans is attributable to Debtor's disorder and is not an indicia of bad faith.

Debtor cannot be forced into a payment plan when an undue hardship exists. Debtor has demonstrated that she is maintaining a minimum standard of living and currently has an income just above the poverty line for single person. *See* Office of the Secretary, Department of Health and Human Services, Annual Update of the HHS Poverty Guidelines, 66 F.R. 10695, 10695 (February 16, 2001). Any reduction in her disposable income would drop her below poverty levels. Taking into account the size of the debt, even minimal payments would be stretched out for many years. Allowing such a result would just exacerbate Debtor's already precarious situation.

### CONCLUSION

Evaluating the record as a whole, the Court finds that Debtor has carried her burden of proving that an undue hardship exists under § 523(a)(8), despite the strong legislative policy against discharge such loans. Certainly, it is hopeless that Debtor would ever be able to repay her student loan obligations. Debtor does not merely face "garden variety" hardship but a lifelong debilitating mental illness which severely impairs her ability to pay back her student loans.

**WHEREFORE,** Debtor's student loan obligations owed to Defendants U.S. Department of Education, the University of Northern Iowa, Waldorf College, Iowa Student Loan Liquidity Corp., and Iowa College Student Aid Corp. create an undue hardship pursuant to § 523(a)(8).

**FURTHER,** Debtor's student loan debts owed to the above-named defendants are discharged.

**FURTHER,** since proper service was not shown by Debtor, the interests in the student loans held by Cylinder State Bank are not affected by this decision.