# United States Bankruptcy Appellate Panel
## FOR THE EIGHTH CIRCUIT

_____

No. 01-6042MN

_____

In re: Nanci Anne Long,  *
                          *
     Debtor.                *
                          *

Nanci Anne Long,  *
                          *

     Plaintiff-Appellee,      *     Appeal from the United States
                          *     Bankruptcy Court for the
     v.                 *     District of Minnesota
                          *

Educational Credit Management  *
Corporation,  *
                          *

     Defendant-Appellant,    *
                          *

United States Department of Health  *
and Human Services,  *
                          *

     Defendant.            *

_____

Submitted: December 4, 2001
Filed: January 10, 2002

_____

Before KOGER, Chief Judge, WILLIAM A. HILL and SCHERMER, Bankruptcy Judges.

_____

WILLIAM A. HILL, Bankruptcy Judge.

Educational Credit Management Corporation appeals from a bankruptcy court[1] order declaring the student loan debt owed it by Nanci A. Long dischargeable under 11 U.S.C. § 523(a)(8).  For the reasons set forth below, we affirm.

## FACTUAL BACKGROUND

Nanci A. Long is a 39-year-old single woman with a 10-year-old daughter.  In 1987, she graduated from chiropractic school at Northwestern College of Chiropractic and became a licensed Doctor of Chiropractic.  She paid for her chiropractic school tuition partially through student loans, including one currently held by Educational Credit Management Corporation ("ECMC").

After graduation from chiropractic school, Long opened a practice, Four Seasons Chiropractic, with a fellow classmate.  The practice was unsuccessful and only lasted seven months.  After the failure of the practice, Long went to work at Kari Clinic, where she had interned during chiropractic school.  She worked at Kari Clinic three years, during which she bought a house.  In 1990, she and another Kari Clinic employee left to open their own new practice, The Back, Joint and Health Clinic.  The new clinic was successful from 1990 to 1993.  Long adopted her daughter in January 1993.

In early 1993, Long began to have "flu-like" symptoms, such as headaches and fatigue.  She continued to work, but also began to suffer depression, anxiety, obsessive thoughts, and compulsive behavior.  She had to take breaks during the day, was uncomfortable touching her patients, and began to forget her chiropractic training.  She was unable to work for increasing amounts of time, canceling appointments and occasionally missing work altogether.  Although her condition

---

[1] The Honorable Dennis D. O'Brien, United States Bankruptcy Judge for the District of Minnesota.

deteriorated over a period of approximately two years, Long did not seek medical help.

In 1995, Long decided she could no longer continue her practice. She found another chiropractor to take over the remains of her business, and transferred it to him without compensation.

After leaving her practice, she sold her house because her financial situation had become strained. She moved in with a friend and lived with the friend from September until December 1996. During the time Long lived with her friend, she attempted suicide. In December 1996, she moved into her parents' house.

Long went to see a doctor for the first time in January 1997. She went to a general practitioner, Dr. Stephen Voss, and told him that she had been having trouble sleeping. Dr. Voss gave Long medication and referred her to a psychologist, Dr. Jeffrey Penwarden. Dr. Penwarden started therapy with Long. Long also was still seeing Dr. Voss, who prescribed different combinations of medications in an effort to help Long. Dr. Voss ultimately referred Long to a psychiatrist, Dr. Ann Waldron, who similarly prescribed various medications for Long. Long met with these doctors for approximately a year. Eventually, a medication regimen was developed that allowed Long to regain the ability to function marginally.

In the fall of 1998, Long enrolled at Metropolitan State University because, she testified, "I knew that I wasn't going to be able to practice again." She chose Metropolitan State to pursue a degree in human services and a minor in social gerontology because of its affordability and because it offered home-study classes. Long is interested in a career in hospice counseling.

To keep her chiropractic license valid, Long was required to attend continuing education classes. Long failed to keep her continuing education credits current, and

her chiropractic license lapsed at the end of 1999. She testified that she chose to attend Metropolitan State rather than continuing her chiropractic education because the continuing education classes were significantly more expensive and because she had lost too much of her memory to return to chiropractic practice.

On May 31, 2000, Long filed a voluntary petition under Chapter 7 of the Bankruptcy Code. She commenced an adversary proceeding against ECMC and the United States Department of Health and Human Services ("DHHS"), seeking to discharge her student loan debts.

At the trial on the matter, Long testified that she works approximately 32 hours per week as a laboratory manager at Anoka Ramsey Community College. She earns $12.59 per hour, or approximately $1,150.00 per month and $14,000.00 per year. She only works during the school year. She also testified that she had recently applied for alternative employment that would provide her experience in the human services field.

She lives with her daughter in her parents' basement, paying them between $500.00 and $600.00 per month to cover rent, utilities, car payment, car insurance, health insurance, cellular telephone, child care for her daughter, and most of the food for her and her daughter. The monthly expenses that she pays herself include: approximately $50.00 for medical insurance co-payments, personal items, and toiletries; $100.00-$275.00 for gasoline; approximately $100.00 for dining out, groceries, and entertainment; and $80.00 for her daughter's private school tuition. Long also pays for courses she takes at Metropolitan State University and Cambridge Community College. Her college tuition varies in price ($500.00 to $800.00) depending on the course.

Long testified that her present symptoms include severe memory loss, fatigue, depression, panic attacks, headaches, and weight gain. She is currently taking several

prescription medications and sees Dr. Voss approximately once per month. None of Long's doctors nor any other doctor testified at trial, and no documentary evidence describing the nature or extent of her condition was introduced into evidence. However, neither of the defendants offered any testimony or other evidence to rebut Long's testimony.

At the time of trial, Long owed ECMC approximately $61,800.00. This amount includes principal, interest, and collection costs on consolidated student loans. Long's obligation to ECMC originated with a disbursement of a $35,322.81 Sallie Mae consolidation loan to Long on December 11, 1987. When Long defaulted on her student loan obligations, the loan was transferred to Great Lakes Higher Education Corporation. After Long filed her bankruptcy petition, the loan was assigned to ECMC.

During school, Long also obtained through DHHS three loans guaranteed by the Health Education Assistance Loan ("HEAL") Program. The bankruptcy court determined this debt in the approximate amount of $14,700.00 was nondischargeable.

Daniel Fisher, an associate attorney for ECMC, testified that the Department of Education has a program called the William D. Ford Loan Consolidation program ("the program"). The program offers debtors three options for repayment of loans consolidated through the program. Eligibility for the program is determined by whether a debtor's loans are among the loans enumerated as eligible in the regulations. One of the repayment options is the Income Contingent Repayment Plan ("ICRP"), through which a debtor makes payments on the loans according to his or her income. The payment amount is determined annually based on the debtor's income. Fisher testified that each of the loans comprising Long's indebtedness to ECMC would have qualified for the program, and that based on her $14,000.00 annual income, she would have had monthly loan payments of $54.00 under the ICRP that would cover her payments to both ECMC and DHHS. He also stated, through

5

counsel and after the close of evidence, that if Long participated in the ICRP, any remaining loan balance would be canceled after 25 years. When asked whether Long and her counsel were made aware of the program, Fisher testified:

> Yes. I know that your associate had sent me a letter that she had proposed to send to the debtor's counsel informing them, citing them the regulation, giving them the web site where they could have the interactive calculator, and I made some suggested modifications and approved that to send to the debtor's counsel.

Long testified that she was aware of the possibilities of a plan where she would be considered current on her outstanding student loans by paying $40.00 to $50.00 per month, but she did not apply for the ICRP. When asked why she did not apply, Long testified:

> There hasn't been people that were willing to help me through it first of all. Second of all really I've paid on these student loans faithfully for over ten years and I know that on at least one of the loans I've paid even over the principal amount. I never missed a payment. I was faithful on my intentions and everything and then when I needed help with them nobody was helping me. Nobody cared and how can I – how can I let some agency just take a certain amount of money from me at their own will when I'm trying to live without having to live at my parents' house.

The bankruptcy court concluded that Long's repayment to ECMC of her student loan indebtedness would constitute an undue hardship, and a judgment was entered discharging the debt. ECMC appeals.

## STANDARD OF REVIEW

We review the bankruptcy court's conclusions of law de novo and its findings of fact for clear error. See Fed. R. Bankr. P. 8013; Ford v. Student Loan Guarantee

6

Found. of Ark. (In re Ford), 269 B.R. 673, 675 (B.A.P. 8th Cir. 2001). A determination of undue hardship within the meaning of 11 U.S.C. § 523(a)(8) is a factual determination and is reversible only for clear error. Svoboda v. Educational Credit Mgmt. Corp. (In re Svoboda), 263 B.R. 190, 194 (B.A.P. 8th Cir. 2001) (citing Andresen v. Nebraska Student Loan Program, Inc. (In re Andresen), 232 B.R. 127 (B.A.P. 8th Cir. 1999)). A finding of fact is clearly erroneous if we are left with a firm and definite conviction that a mistake has been made by the bankruptcy court. Ford, 269 B.R. at 675. We may not overturn the bankruptcy court's factual findings merely because we might have decided the issue differently. Reid v. Checkett & Pauly (In re Reid), 197 F.3d 608, 320 (8th Cir. 1999). "'To be clearly erroneous, a decision must strike us as more than just maybe or probably wrong; it must . . . strike us as wrong with the force of a five-week-old, unrefrigerated dead fish.'" Ford, 269 B.R. at 675 (quoting In re Papio Keno Club, Inc., 262 F.3d 725, 728 (8th Cir. 2001)).

ECMC urges us to reconsider our standard of review. ECMC argues that de novo review is the appropriate standard, rather than reviewing for clear error, because courts from other circuits have held that a determination of whether excepting a student loan from discharge will impose undue hardship is a question of law subject to de novo review and that factual findings underlying the determination are reviewed for clear error. See, e.g., Cheesman v. Tennessee Student Assistance Corp. (In re Cheesman), 25 F.3d 356, 359 (6th Cir. 1994). We have previously acknowledged and rejected this position. See Andresen, 232 B.R. at 128 n.2 (stating, "We do not agree with this narrow distinction. While defining undue hardship is a question of law, we think that the determination of whether excepting a student loan from discharge will result in undue hardship for the debtor and the debtor's dependents is a question of fact."). We decline to revisit the issue. A bankruptcy court's determination of whether excepting a student loan from discharge will impose undue hardship is a factual determination and is reversible only for clear error. Svoboda, 263 B.R. at 194.

## DISCUSSION

Pursuant to Section 523(a)(8) of the Bankruptcy Code, a student loan obligation is excepted from discharge "unless excepting such debt from discharge . . . will impose an undue hardship on the debtor and the debtor's dependents." 11 U.S.C. § 523(a)(8). The debtor has the burden of proving undue hardship by a preponderance of the evidence. Ford, 269 B.R. at 675.

A number of tests have been developed over the last two decades to be used in determining whether undue hardship exists, and the tests have some significant differences. Three main approaches or tests have emerged from the case law interpreting undue hardship. In Andresen v. Nebraska Student Loan Program, Inc. (In re Andresen), 232 B.R. 127 (8th Cir. B.A.P. 1981), we discussed these various tests for undue hardship at length and concluded that, based on the Eighth Circuit Court of Appeals' decision in Andrews v. South Dakota Student Loan Assistance Corp. (In re Andrews), 661 F.2d 702 (8th Cir. 1981), which is the only Eighth Circuit case addressing the issue then and now, the "totality of the circumstances" test is the controlling test in this jurisdiction. We reached this conclusion not because the Court of Appeals explicitly rejected or adopted any particular test, but rather, by inference from the analysis used by the Andrews court. The "totality of the circumstances" test for undue hardship requires consideration of (1) the debtor's past, present, and reasonably reliable future financial resources; (2) calculation of the debtor's and the debtor's dependent's reasonable necessary living expenses; and (3) any other relevant facts and circumstances surrounding the particular bankruptcy case. Andresen, 232 B.R. at 139. Regarding the first and second factors, the debtor should demonstrate that she has "done everything possible to minimize expenses and maximize income," and the possibility of changes in the future should also be presented. See United States Dep't of Educ. v. Rose (In re Rose), 227 B.R. 518, 526 n.11 (W.D. Mo. 1998), aff'd in part, rem'd in part, 187 F.3d 926 (1999).

8

In this case, the bankruptcy court concluded that repayment of the student loan indebtedness to ECMC would impose an undue hardship on Long and discharged the debt. ECMC argues the bankruptcy court clearly erred in finding that excepting Long's student loans from discharge would constitute undue hardship. We find no clear error and affirm the order of the bankruptcy court.

      1.      Past, Present, and Reasonably Reliable Future Financial Resources

As to this factor, ECMC asserts Long did not present medical testimony, nor did she testify, as to her medical prognosis. Thus, ECMC argues, the bankruptcy court clearly erred by finding that Long's medical condition would persist into the future and would interfere with her future earning potential.

Mental illness, if sufficiently debilitating and unlikely to improve, can provide support for discharging a student loan debt. See, e.g., In re Pena, 155 F.3d 1108, 1113 (9th Cir. 1998) (debtor's depression, manic depression, schizophrenia, and paranoia supported discharge of student loans); Meling v. United States of America (In re Meling), 263 B.R. 275, 279 (Bankr. N.D. Iowa 2001) (debtor's bipolar disorder supported discharge of student loans); Green v. Sallie Mae Servicing Corp. (In re Green), 238 B.R. 727, 737 (Bankr. N.D. Ohio 1999) (debtor's bipolar disorder supported discharge of student loans). However, the bankruptcy court in Swinney v. Academic Fin. Serv. (In re Swinney), 266 B.R. 800, 805 (Bankr. N.D. Ohio 2001) (citing Hatfield v. William D. Ford Fed. Direct Consolidation Program (In re Hatfield), 257 B.R. 575, 581-82 (Bankr. D. Mont. 2000)), held that substantial credible evidence must support the existence of the mental illness. See also Dennehy v. Sallie Mae (In re Dennehy), 201 B.R. 1008, 1012 (Bankr. N.D. Fla. 1996) (debtor with bipolar disorder did not present medical evidence that would suggest his bipolar disorder would prevent him from obtaining employment in the future or other evidence that his current financial situation would persist into the future; therefore the court determined his student loan debt was nondischargeable). The bankruptcy

9

court in Swinney opined that although such evidence does not necessarily have to consist of expert testimony, it should consist of more than simply bare allegations; that is, whenever a debtor's health, whether mental or physical, is directly put at issue some corroborating evidence must be given supporting the proponent's position. Swinney, 266 B.R. at 805. See also Hallberg v. Montana Guaranteed Student Loan Program (In re Hallberg), Nos. 01-21988-7, 01/00071, 2001 WL 1555191, at *2 (Bankr. D. Mont. Nov 30, 2001) (although debtor may testify that she was diagnosed and treated for depression at a past date, such facts have little bearing on her current mental health; debtor is not qualified to establish factually, through her own testimony, that she suffers from depression; if she currently suffers from depression it must be established through expert testimony and/or exhibits).

In Cline v. Illinois Student Loan Assistance Ass'n (In re Cline), 248 B.R. 347 (B.A.P. 8th Cir. 2000), we reviewed a bankruptcy court's determination that a debtor's student loan debt was dischargeable on the basis of undue hardship. The bankruptcy court in Cline had determined that the debtor could endure only work that was essentially ministerial and that she suffered from the stress of increased responsibility due to a lack of self-confidence. Id. at 350. We stated:

> While there was no evidence that the debtor was clinically disabled or maladjusted, the bankruptcy court expressly found that [the debtor] was not fit for the higher responsibility and higher paying positions she tried and then left. There is no reason to view the trial court's findings as unreliable merely because no expert evidence was introduced. The record offers no reason to suggest that the bankruptcy court made its decision without due consideration.

Id.

At the dischargeability hearing, Long testified that she works as a laboratory manager and has a current net monthly income of $1,150.00. The bankruptcy court

10

found that Long "will ultimately get herself out of this unfortunate situation and circumstance that she is in[,]" but that although "there is good reason to believe that this debtor's medical situation will improve and perhaps that her employment and income will improve somewhat, her responsibilities with respect to herself and her child for the foreseeable future are at best substantial." Finally, the court found:

> Based upon the severity of the illness and the historical – the historical intensity of it and the overall prognosis with respect to her ultimate condition it is highly unlikely that in the foreseeable future she is going to earn the kind of money that would ever be able to begin to dig herself out of these non-HEAL loans, particularly under circumstances where the HEAL loans must under the standards applied remain nondischargeable.

There is some evidence, through Long's testimony, that her condition supports a finding that it is unlikely she is going to earn an income sufficient to repay her debt to ECMC. She testified at length about her current financial status, the history behind her current financial status, and her concerns and difficulties with regard to providing for herself and her daughter in the future. She testified that her present symptoms include severe memory loss, fatigue, depression, panic attacks, headaches, and weight gain. She believes she is incapable of returning to chiropractic practice and is pursuing an alternative career in human services. Moreover, ECMC did not offer any evidence to contradict Long's testimony. Although we might have weighed Long's testimony differently in the first instance, it is not our place to re-evaluate the evidence. See Cline, 248 B.R. at 350. The bankruptcy court appropriately considered Long's medical condition and prognosis when examining her present and future financial resources.

ECMC also contends that the bankruptcy court contradicted itself by noting in the context of its decision to not discharge the HEAL loans that "there is good reason to believe that [Long's] medical situation will improve and perhaps that her

employment and income will improve somewhat." However, we find no inconsistency in the bankruptcy court's ruling. The standard of dischargeability of HEAL loans versus non-HEAL loans is dramatically different. The bankruptcy court was required to apply the almost insurmountable unconscionability standard to determine dischargeability of the HEAL loans under 42 U.S.C. § 292f(g), and it was not inconsistent for the bankruptcy court to have ruled that the unconscionability standard was not met for the reason that there might be some chance that Long's financial position might improve to the point where she might be able to make payments on the HEAL loans. On the other hand, a debtor need only show undue hardship under 11 U.S.C. § 523(a)(8) in order to discharge non-HEAL loans. Here, the bankruptcy court correctly applied the appropriate standard to the HEAL and non-HEAL loans when making its determination.

2.      Necessary Reasonable Living Expenses

ECMC asserts Long has made voluntary lifestyle choices that have adversely affected her capacity to make the $54.00 monthly ICRP payment, including working only 32 hours per week and nine months per year, sending her child to private school, going to movies, dining out for lunch while at work, and entertaining friends.

The bankruptcy court did not address Long's expenses individually. Rather, the bankruptcy court stated, "In all probability [Long's student loan] obligation would continue to grow and such a situation and circumstance under a situation where she would contribute even her best and utmost efforts is not a circumstance and situation that satisfies the test."

The broad issue of lifestyle changes and how they effect matters such as the discharge of educational loans was the subject of a recent law review article. See generally A. Mechele Dickerson, Lifestyles of the Not-So-Rich or Famous: The Role of Choice and Sacrifice in Bankruptcy, 45 Buff. L. Rev. 629 (1997). The author of

the article comments that courts generally deny lifestyle choices only when they appear excessive, not because the choices themselves are not economic necessities. See id. at 638 (arguing that the term "necessary" should be interpreted narrowly).

A few courts have dealt with cases specifically involving debtors paying to send their children to private school. In Miller v. U.S. Dep't of Educ. (In re Miller), 254 B.R. 200 (Bankr. N.D. Ohio 2000), the bankruptcy court found that the debtor failed to articulate a satisfactory reason as to why her 7-year-old son needed to attend private school, as opposed to public school, at an annual expense of $1600.00, and denied the debtor a discharge of her student loan debt. . However, unlike the $61,000.00 debt at issue in the instant case, the student loan debt in Miller was approximately $3,000.00, and the court emphasized that if the funds utilized for her son's tuition were instead applied toward the repayment of her student loan obligation, the debtor's obligation could easily be satisfied in less than two years. Id. at 205. In another case, Conner v. Illinois State Scholarship Comm'n (In re Conner), 89 B.R. 744 (Bankr. N.D. Ill. 1988), the bankruptcy court found that the debtor's choice to pay for her daughters to attend private school was a self-imposed expense. However, the debtor in Conner was paying for her children to attend private colleges, rather than elementary school, as in the instant case. Id. at 749.

Long's expenses include $500.00 to $600.00 per month to her parents to cover rent, utilities, car payment, car insurance, health insurance, cellular telephone, child care for her daughter, and most of the food for her and her daughter; approximately $50.00 for medical insurance co-payments, personal items and toiletries; $100.00-$275.00 for gasoline; approximately $100.00 for dining out, groceries, and entertainment; and $80.00 for her daughter's private school tuition. Her college tuition varies between $500.00 and $800.00 per class.

We will not go over Long's expenses dollar for dollar. See Cline, 248 B.R. at 351 (stating that "going over [a debtor's] expenses dollar for dollar in order to find

every possible way to boost a surplus is not reasonable given that the overall total remains firmly minimal"). Long lives modestly, and by living with her parents, she has reduced her living expenses significantly. Upon a review of Long's expenses as a whole, we cannot say that the bankruptcy court clearly erred by not finding some of her expenses to be unreasonable.

      3.     Other Relevant Facts or Circumstances

ECMC argues Long did not claim that the repayment of her loans under the ICRP repayment plan she was offered would cause her an undue hardship, and that the bankruptcy court mistakenly thought Long would be required to pay the full amount of her debt to ECMC under the ICRP at the end of the 25-year period.

The bankruptcy court stated:

> What she would be faced with is a sentence of 25 years in payments on an obligation that she could never realistically expect to retire or even reduce. In all probability the obligation would continue to grow and such a situation and her best and utmost efforts is not a circumstance and situation that satisfies the test. Under those circumstances given the other difficulties that she has, the other responsibilities that she has, the other commitments that she has, that obligation in that amount which now I believe is approaching if not over $60,000.00 is unrealistic.

> It is unrealistic. It would constitute an undue hardship and it would impose an unjustifiable burden added to these other burdens that she has and that she must overcome.

First, our review of the record shows that the bankruptcy court did not expressly find, nor evidence a mistaken belief, that the full amount still owing on the debt would become due after 25 years. Rather, the bankruptcy court determined that she would not be able to "retire or even reduce" her obligation. Given the significant

amount of the debt, Long's minimal current and future ability to pay against the debt, and the compounding effect of interest on the debt, this determination is not clearly erroneous. Furthermore, Section 523(a)(8) focuses on the burden of the debt itself, and not on the burden of a particular repayment schedule. 11 U.S.C. § 523(a)(8). The bankruptcy court clearly stated that Long's ability to repay the debt to ECMC is unrealistic in light of her other burdens and difficulties. The bankruptcy court considered the ICRP when it considered the totality of the circumstances, and its determination is not clearly erroneous.

## CONCLUSION

After careful review of the evidence and testimony in this case and consideration of the arguments raised by ECMC on appeal, we simply are not left with a definite and firm conviction that the bankruptcy court made a mistake. Accordingly, we hold that the bankruptcy court did not clearly err in determining that Long's student loan debt to ECMC was dischargeable, and we affirm the judgment.

SCHERMER, Bankruptcy Judge dissenting.

Because I believe the evidence in this case amply supports Ms. Long's ability to pay $54.00 per month under the ICRP program, I respectfully dissent. Assuming her current income level is maintained throughout her lifetime, the remaining loan balance would be cancelled after 25 years. Accordingly, I conclude that the evidence does not support a finding of undue hardship and that the debtor has failed to meet her burden under § 523(a)(8) of the Bankruptcy Code. See my dissent in Cline v. Illinois Student Loan Assistance Association (In re Cline), 248 B.R. 347, 351 (B.A.P. 8th Cir. 2000).

A true copy.

Attest:

CLERK, U.S. BANKRUPTCY APPELLATE PANEL,
EIGHTH CIRCUIT.