In re Thomas Francis BARRETT, Jr., Debtor.

Thomas Francis Barrett, Jr., Plaintiff,

v.

Sallie Mae Servicing, et al., Defendants.

Bankruptcy No. 01–45444.
Adversary No. 02–4164.

United States Bankruptcy Court, N.D. Ohio.

Dec. 14, 2004.

Michael D. Buzulencia, Esq., Warren, OH, for trustee.

## MEMORANDUM OPINION

KAY WOODS, Bankruptcy Judge.

A trial was held in this matter on November 23, 2004. Debtor/Plaintiff, Thomas Francis Barrett, Jr. ("Debtor" or "Plaintiff"), was represented by Robert A. Ciotola. Esq. Defendant, Educational Credit Management Corporation ("ECMC" or "Defendant"), was represented by Frederick S. Coombs, III, Esq. This Court has jurisdiction of this case under 28 U.S.C. § 1334. This matter constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(i). Furthermore, in accordance with FED. R. BANKR. P. 7052, the

Court's findings of fact and conclusions of law are set forth in this opinion.

## FACTS

Debtor filed a voluntary Chapter 7 bankruptcy petition on December 28, 2001.[1] Debtor's schedules indicated that he owns no real property and only minimal personal property, including household goods and furnishings valued at Three Hundred Dollars ($300.00), wearing apparel valued at Three Hundred Dollars ($300.00), a computer valued at Two Hundred Dollars ($200.00) and cash or other financial accounts in the amount of Three Hundred Twenty Dollars ($320.00). Debtor listed no secured or unsecured priority claims and listed unsecured nonpriority claims in the amount of Three Hundred Two Thousand Three Hundred Forty–Two Dollars ($302,342.00). Approximately 60% of the unsecured scheduled debt, i.e., One Hundred Eighty–Three Thousand Seven Hundred Eighty–One Dollars ($183,-781.00), is described as "medical bills." Debtor also scheduled two student loans in the total amount of Ninety–Four Thousand Seven Hundred Fifty–One Dollars ($94,-751.00) (one in the amount of Sixty–Nine Thousand Five Hundred Fifty Dollars ($69,550.00) and the other in the amount of Twenty–Five Thousand Two Hundred One Dollars ($25,201.00)). As such, the scheduled student loans were approximately half of Debtor's scheduled medical bills.

Plaintiff filed the instant adversary proceeding on September 27, 2002 seeking a discharge of his student loans on the basis of undue hardship. On November 19, 2002, the Court entered an order granting the motion to substitute party, ECMC for original Defendant, Sallie Mae Servicing. Defendant filed its answer on November 19, 2002. The trial in the matter was scheduled and continued from time to time and was held on November 23, 2004.

In its opening statement, Defendant stated it had obtained all the student loans by assignment and that the amount of the student loans was not at issue. Plaintiff testified on his own behalf, but did not present any other witnesses. Defendant did not present any witnesses.

Plaintiff is a 34 year old single man with a long history of medical problems, some of which occurred prior to the time he obtained the student loans at issue.[2] Plaintiff received his undergraduate degree from the University of Rhode Island without the assistance of any government backed student loans.

Plaintiff testified that although he was "not 100%" healthy, he started a graduate school program at the University of St. Louis in 1996 to obtain a Master's degree in Health Administration and an MBA. At this time he applied for and received the first of his student loans. As part of his course work, Plaintiff took certain medical classes at the medical school from doctors,

1. Debtor's voluntary petition dated 11–13–01 and schedules thereto were admitted collectively as Exhibit 1 at the trial.

2. Plaintiff's health problems began when he was an undergraduate at the University of Rhode Island in 1989. He was initially diagnosed with mononucleosis. In the fall of 1991, after he noticed that he had black spots in his field of vision, he was diagnosed with Pars Plinitus, a disease of the retina, which is also an autoimmune condition. During spring semester 1992, Plaintiff began to suffer

high fevers, severe night sweats and loss of weight. His symptoms became so severe that he left the University of Rhode Island and returned to his parents' home in Youngstown, Ohio, to seek treatment. Although he consulted a physician and had blood tests and a CAT scan, his symptoms subsided and the doctor was not able to make a diagnosis. Despite his health problems, Plaintiff returned to the University of Rhode Island, finished his undergraduate work and received his degree.

including courses in cystology, gross anatomy and neuro anatomy. In addition to the student loans, Plaintiff sought and obtained employment at St. Louis Hospital to help pay for school and his living expenses.[3]

By the spring of 1999 when he received his graduate degree from St. Louis University, Plaintiff was ill with high fevers, night sweats and weight loss. In October 1999, a CAT scan showed that Plaintiff had an enlarged liver and spleen. A biopsy of the liver showed an infection, but was inconclusive. He subsequently left St. Louis and returned to Youngstown. Plaintiff testified that during this time a "good day" consisted of having a temperature of 102 degrees and suffering from night sweats and severe pain. During the summer of 2000, Plaintiff was treated at the Cleveland Clinic by Dr. Brad Pohlman, an oncologist. At this time, Plaintiff was diagnosed with Hodgkin lymphoma, stage IVB. He was treated with a combination of chemotherapy called ABVD every two weeks for a period of nine months. ABVD consists of Adriomycin, Bleomycin, Vinblastine and Dicarbizine. Plaintiff testified that these drugs had adverse effects on his lungs and circulatory system.

Plaintiff's Hodgkin lymphoma is currently in remission, as evidenced by a letter from Dr. Pohlman, dated February 14, 2003.[4] This letter indicates that Plaintiff received eight cycles of ABVD, ending in March 2001 and that he additionally had vasculitis, which preceded the diagnosis of lymphoma. Plaintiff testified that Dr. Pohlman was not involved with his treatment or diagnosis of Avascular Necrosis and that the letter was written prior to Plaintiff's diagnosis of Avascular Necrosis.

Plaintiff testified that in October 2002, he began having severe pain in his right shoulder and pain (although less severe) in his left shoulder. His doctor prescribed Oxycontin for the pain (20 mg twice a day), but Plaintiff testified that he had "break through" pain that the medication did not control. He was diagnosed with Avascular Necrosis, which is a condition that causes the patient's bones to die from lack of blood supply. Plaintiff testified that he suffered from "massive" pain, predominantly in his shoulders, but also in his hips and knees. He had surgery on his right shoulder at the Cleveland Clinic in April 2004. After the surgery, which replaced the shoulder joint with a titanium cap, he continued to experience extreme pain in the right shoulder that was not controlled by pain medication. In August 2004, he had a second surgery to the right shoulder at the Cleveland Clinic when it was determined that the replacement cap was loose. At the time of the trial, Plaintiff was wearing a sling on his right arm to support the shoulder and was still recovering from the August surgery. Plaintiff testified that he currently cannot even hold a cup of coffee in his right hand because of the pain in his right shoulder. He is currently taking 40 mg of Oxycontin three times per day and

3. In order to work at the hospital, Plaintiff had to be inoculated with vaccinations for MMR, DPT and Hepatitis B. About this time, Plaintiff began to lose sensation in his feet, which he described as feeling like "pins and needles." This loss of sensation became so bad that he could not tell the difference between not and cold. It was determined that Plaintiff's symptoms were not related to the inoculations. Additionally, in March 1997, Plaintiff experienced a Transient Ischemic Attack ("TIA"), which resulted in right side hemi-paresis (i.e., paralysis to his right side). He was hospitalized for this condition and given tests and medication. Plaintiff said that the TIA caused him to lose grammar skills and that he had to relearn grammar after his release from the hospital.

4. This letter was admitted as Exhibit 6 at the trial.

two other medications, but Plaintiff testified that they are not sufficient to control the pain. In addition to severe pain in his right shoulder, Plaintiff said that he has pain in his left shoulder equivalent to the pain he had in his right shoulder prior to the first surgery, as well as pain in both hips and knees. He anticipates that he will have to have additional surgery on all of these joints because of the Avascular Necrosis, but that the surgeries will have to be done sequentially, allowing time for each of the prior surgeries to heal.

Plaintiff's medical condition has deteriorated since filing the Chapter 7 petition, causing him to incur additional debt for medical bills and expenses in the approximate amount of Twenty Thousand Dollars ($20,000.00), which he said he cannot afford to pay. He currently goes to the Cleveland Clinic for doctor visits five times per month and incurs a Twenty Dollar ($20.00) co-pay for each visit. He has travel and parking related expenses with each doctor visit. Although Plaintiff's amended Schedule J lists monthly expenses for prescriptions in the amount of Three Hundred Dollars ($300.00), he testified that his prescriptions run Six Hundred Dollars ($600.00) per month. Because of his health problems, Plaintiff testified that it is important for him to maintain his health insurance through United Health Care, which costs approximately One Thousand Dollars ($1,000.00) per month. Because he does not have income to pay for health insurance, Plaintiff testified that his parents help him out by paying that bill and some others. He further testified that his parents are in their mid–60's and that he cannot count on their financial help into the future.

Plaintiff testified that he has never been able to work full time because of the pain he experiences. He has held some part-time jobs in the past and he is currently self employed doing computer related work.[5] Plaintiff said that he has looked for part-time work in his field, utilizing both the Internet and applying to the medical facilities where he receives treatment, but part-time work for which he is qualified is not available. In seeking work, he stated that potential employers always lose interest in him when they learn of his health related problems. Plaintiff further testified that, because of the severe pain, which he is not able to control with medication, and/or the several anticipated surgeries on his other shoulder, hips and knees—each with a recovery period—he does not anticipate being able to work full time into the foreseeable future.

In addition to not being able to make payments on the debt for medical bills, Plaintiff stated that he could not afford to pay his student loans. He further testified that, although he had not made any payments on the two student loans, he had always had deferments based upon his health problems and/or his economic circumstances. As a consequence, no payments have actually become due on the loans. In addition, Plaintiff testified that he had not taken advantage of the Income Contingent Repayment Program ("ICRP") because the income taxes for which he would be liable on the amount of debt that would be forgiven by the government was almost as large as the principal amount of the unpaid student loans. Plaintiff testified that he had used the ICRP computer program to calculate his payments using an income of Fifteen Thousand Dollars ($15,000.00) per year (despite the fact that his income has not been that high in the past couple of years), loan amount of One Hundred Thousand Dollars ($100,000.00) and a 4% interest rate. Using those fig-

---

**5.** He testified that he is able to move a computer mouse with his left hand.

ures, at the end of 25 years, Plaintiff would have made only modest payments on the loans, requiring the government to write off approximately Two Hundred Sixty-Eight Thousand Seven Hundred Sixty-One Dollars ($268,761.00), which write off amount would be attributable as taxable income to Plaintiff. If he used ICRP, Plaintiff would, in effect, be trading one nondischargeable debt for another.

## LEGAL ANALYSIS

In the Bankruptcy Code, Congress has enacted public policy making student loans generally nondischargeable. The Bankruptcy Code provides:

A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

. . . . .

(8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents[.]

11 U.S.C. § 523(a). As a consequence, Plaintiff will not be able to discharge the student loans in question unless he can establish that it will impose an undue hardship on Debtor if such loans are not excepted from discharge.

 The Bankruptcy Code does not define "undue hardship," leaving the task to the courts. "Courts universally require more than temporary financial adversity and typically stop short of utter hopelessness." *Tenn. Student Assistance Corp. v.*

*Hornsby (In re Hornsby),* 144 F.3d 433, 437 (6th Cir.1998). The Sixth Circuit Court of Appeals has declined to adopt any one test and instead looks to many factors. *See, Cheesman v. Tenn. Student Assistance Corp. (In re Cheesman),* 25 F.3d 356, 359 (6th Cir.1994), *cert. denied,* 513 U.S. 1081, 115 S.Ct. 731, 130 L.Ed.2d 634 (1995). *See also, Rice v. United States (In re Rice ),* 78 F.3d 1144, 1149 (6th Cir.1996). Although the Sixth Circuit considers the three factors set forth in *Brunner v. New York State Higher Education Services Corp.,* 831 F.2d 395 (2nd Cir.1987) *(per curiam),* which is the most widely accepted test to determine undue hardship, it also considers, among other things, "the amount of the debt ... as well as the rate at which interest is accruing" and "the debtor's claimed expenses and current standard of living, with a view toward ascertaining whether the debtor has attempted to minimize the expenses of himself and his dependents." *Rice,* 78 F.3d at 1149. Under the so-called *Brunner* test,

a debtor must establish that the following three elements are in existence in order to have a student loan discharged on the basis of "undue hardship" under § 523(a)(8):

(1) the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans;

(2) additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period; and

(3) the debtor has made good faith efforts to repay the loans.

*Flores v. U.S. Dep't of Educ. (In re Flores),* 282 B.R. 847, 853 (Bankr.N.D.Ohio 2002), *(citing Brunner,* 831 F.2d 395). With respect to this test, it is the debtor's burden to establish, by a preponderance of

the evidence, that each of its elements have been met. *See, Grine v. Tex. Guaranteed Student Loan Corp. (In re Grine)*, 254 B.R. 191, 197 (Bankr.N.D.Ohio 2000).

This Court will start its analysis by looking at the *Brunner* test to see if Plaintiff meets each of the elements. Based upon the schedules filed with the bankruptcy petition and testimony at trial, Debtor's current income is somewhere between Eight Hundred Fifty ($850.00) and One Thousand Two Hundred Dollars ($1,200.00) per month. His current living expenses, as set forth in the schedules and the testimony at trial, are modest and reasonable. Debtor's monthly income does not allow him to meet his basic needs for health insurance and prescriptions, let alone other living expenses. By any standard, Plaintiff has established that he cannot maintain, based on current income and expenses, the minimal standard of living for himself if he is forced to repay the student loans.

The second element of the *Brunner* test requires that additional circumstances exist to indicate that the current state of affairs is likely to persist for a significant portion of the repayment period. Plaintiff testified that he has had health problems since 1989 and that his health continues to deteriorate. He described severe pain that he continues to have, which is not controlled and is barely managed by taking significant doses of Oxycontin and other pain medications. Plaintiff testified that it is likely he will need at least five additional surgeries in the future—one on his left shoulder, one on each of his hips and one on each of his knees—based upon his diagnosis of Avascular Necrosis.

Defendant objected to Plaintiff's testimony in this regard and stated that it was necessary for Plaintiff to have some sort of corroborating evidence or testimony with respect to his future prognosis and his ability to work. Defendant does not challenge Plaintiff's testimony about his medical history and, indeed, Defendant's own exhibit, in the form of the letter from Dr. Pohlman, verifies that Plaintiff has been diagnosed and treated for stage IV Hodgkin lymphoma and received the ABVD chemotherapy treatment. There is also no doubt that Plaintiff actually underwent the two surgeries on his right shoulder earlier this year nor is there any challenge to the fact that Plaintiff is currently being prescribed heavy doses of pain medication. Based upon Plaintiff's physical demeanor, this Court finds it credible that Plaintiff is in a great deal of pain at all times. Even if Plaintiff is not required to have the five or more surgeries that he currently anticipates, which he stated would have a likely recovery period of nine months each, the pain that Plaintiff currently experiences is not likely to subside. As a consequence, this Court finds it credible that Plaintiff's current health problems will likely continue for a significant period into the future and that such problems not only prohibit him from working full time at this time, but will likely prohibit him from obtaining full-time employment into the foreseeable future.

Defendant cites certain cases indicating that corroborating evidence is necessary in order to establish the second element of the *Brunner* test when a medical condition is put at issue. One such case is *Swinney v. Academic Financial Services (In re Swinney)*, 266 B.R. 800 (Bankr.N.D.Ohio 2001). In that case, the plaintiff had alleged that certain mental illnesses, without corroborating evidence, kept her from working full time. The court stated,

> [i]n this case, however, the Debtor, beyond her self-supporting statements, did not introduce any evidence of her mental illnesses. In fact to the contrary, it was clearly shown that the Debtor's mental

difficulties do not rise to the level to enable the Debtor to qualify for Social Security Disability benefits. Furthermore, and also along this same line, the Court questions the validity of the Debtor's statements regarding the debilitating nature of her mental condition(s). In particular, the Debtor, while not working, still seems to be able to perform most of the functions necessary to function in society. For example, the Court takes note of the fact that the Debtor, despite her alcohol problems and potential to take on the personality of a six (6) year old, still considers herself fit enough to operate a motor vehicle on a regular basis. Therefore, given the lack of credibility which the Court can attach to the Debtor's testimony, in conjuncture with the lack of corroborating evidence the Debtor introduced concerning her mental illnesses, the Court cannot find that the Debtor has met her requisite burden under the second prong of the Brunner Test.

*Id.* at 805. In the instant case, however, Plaintiff introduced credible testimony about his own condition that was corroborated, in part, by objective evidence.

*Ryan v. Department of Education (In re Ryan)*, 310 B.R. 387 (Bankr.S.D.Ill.2004) is also distinguishable. In that case, the debtor testified that she was able to find temporary work during the holiday season each year but it was unlikely, if not impossible, that she could find a permanent job because of her physical limitations. The court stated:

Nothing in the medical records submitted by debtor verifies that she is either presently unable to work, or will in the future be unable to work, because of physical limitations and/or pain. In fact, debtor's own testimony establishes that she is able to work every year during the holiday season.

*Id.* at 390.

In the present case, Plaintiff's testimony establishes that he has never been able to work full time since graduation because of severe pain. His testimony further establishes that the pain is not completely controlled despite high doses of pain medication. Thus, Plaintiff's testimony was neither self-serving nor incredible. To require corroborating evidence when Plaintiff is unable to afford expert testimony or documentation [6] imposes an unnecessary and undue burden on Plaintiff in establishing his burden of proof.

Not all courts have determined that corroborating evidence is a necessary element. *Balaski v. Educ. Credit Mgmt. Corp. (In re Balaski)*, 280 B.R. 395 (Bankr. N.D.Ohio 2002). In the *Balaski* case, the court held "[t]he record reveals that this matter is so lopsided as a matter of law and fact that the court should not waste further resources detailing the case. Any interested person or reviewing court needs only to listen to Balaski's credible, concise and compelling testimony." *Id.* at 399. The court held that Balaski had neither wrists, elbows, normal length arms nor fully functioning hands. The court further found that Balaski's hip was degenerating and his spine was fusing and that his shoulder was destroyed due to overuse arising from the absence of function in his arms and hands. Additionally, the court found that Balaski lived with perpetual discomfort. All these findings were based

---

**6.** Plaintiff's counsel argued that they had not been able to submit medical records or obtain medical expert testimony because the cost to obtain such was One Thousand Dollars ($1,000.00) and Five Thousand Dollars ($5,000.00), respectively. Plaintiff said that he cannot make ends meet and did not have any money to spend on corroborating evidence at trial.

upon the plaintiff's own testimony,[7] without corroborating evidence. The court found that Balaski met all the tests for discharging the student loan under the undue hardship criteria.

Although Plaintiff in this case does not have the physical deformities that the court described on behalf of the plaintiff in *Balaski*, that court decided that plaintiff's sole testimony established his degenerating hip, spine fusion, the reason for the shoulder degeneration and his perpetual discomfort. This Court also finds that Plaintiff's testimony in this case is credible with respect to his current medical condition and there has been no inference that Plaintiff in this case has not been diagnosed with Avascular Necrosis nor that he is not in constant pain. As a consequence, this Court finds that Plaintiff has satisfied the second prong of the *Brunner* test.

 The third prong of the *Brunner* test requires that the debtor has made a good-faith effort to repay the loans. In the present case, Plaintiff has made no payments on his student loans; however, no payments have actually become due since he has always received a deferment with respect to such payments. Defendant argues that Plaintiff's failure to take advantage of the ICRP shows that he has not demonstrated the requisite good faith. This Court finds that compliance with the ICRP is not necessary to establish good faith. In *Swinney, supra,* the bankruptcy court found that "it is a difficult, although not necessarily an insurmountable burden for a debtor who is offered, but then declines the government's income contingent repayment program, to come to this Court and seek an equitable adjustment of their student loan debt." *Id.* at 806. However, that did not take into consideration the tax consequences of the debt forgiveness that

the student loan debtor would incur. In the present case, Plaintiff's ability to pay under ICRP would be minimal. As a consequence, the amount of debt to be forgiven would be so large that the tax consequences would be great enough that he would be in no better position with respect to a nondischargeable tax debt than he currently is with a nondischargeable student loan debt. As the court in *Balaski* stated:

> Defendant argues an alternate repayment program, specifically the income contingent repayment program, offers repayment options which would not work an undue hardship on debtor. The court disagrees. Alternate payment plans are just one factor in a lengthy list of factors which can be considered. *See, e.g., Long v. Educ. Credit Mgmt. Corp. (In re Long),* 271 B.R. 322, 332 (8th Cir. BAP 20[0]2); *Ford v. Student Loan Guarantee Found. of Ark. (In re Ford),* 269 B.R. 673, 677 (8th Cir. BAP 2001). Looking at debtor's finances and prospects, the court does not see that debtor's financial situation is going to improve, in the next year or twenty-five years, to provide for any meaningful repayment of the debt. Debtor lives modestly and is unable to meet all expenses with his income, making participation in any repayment plan an undue hardship. While defendant may believe holding debtor hostage for twenty-five years to debt and compounding interest is not an undue hardship, the court does not accept this view.

*Id.* at 400. Likewise, in the *Flores* case, the court held

> [i]n this case, of course, the Debtor has failed to make any payments on her student loan obligation. Notwithstand-

---

7. Although Balaski's physical deformities may have been visible and obvious, the other physical problems were established solely by Balaski's testimony.

ing, this fact, alone, does not automatically foreclose the existence of good faith under the third prong of the Brunner Test. Instead, in determining the existence of good faith, a court should take into account other considerations. In this respect, this Court has set forth the following list of factors which, although not necessary [sic] complete, may be considered in determining whether a debtor acted in good faith:

> (1) whether a debtor's failure to repay a student loan obligation is truly from factors beyond the debtor's reasonable control;
>
> (2) whether the debtor has realistically used all their available financial resources to pay the debt;
>
> (3) whether the debtor is using their best efforts to maximize their financial potential;
>
> (4) the length of time after the student loan first becomes due that the debtor seeks to discharge the debt;
>
> (5) the percentage of the student loan debt in relation to the debtor's total indebtedness[;]
>
> (6) whether the debtor obtained any tangible benefit(s) from their student loan obligation.

*Id.* at 856 (citations omitted). In the present case, Plaintiff has established that his failure to repay his student loan obligation is truly beyond his reasonable control. He has received deferments with respect to such payments based upon his medical condition and/or his economic circumstances. His health problems have prohibited him from working full time since graduation. Plaintiff has realistically used all available financial resources to pay the debt, which financial resources are nonexistent. He has no disposable income that can be applied toward the student loans. Plaintiff has used his best efforts to maximize financial potential, recognizing that his health has not permitted him to work full time, he still works part time to the best of his ability. Plaintiff did not immediately seek to have his student loans discharged and, indeed, testified that but for the medical bills, he would not have filed the Chapter 7 petition, Significantly, Plaintiff's medical bills constitute approximately 60% of his scheduled general unsecured debt and have continued to grow since the filing of his Chapter 7 petition. Plaintiff has not been able to obtain any tangible financial benefit from his student loan obligation since he has never been able to work in the field for which his education has prepared him. As a consequence, this Court finds that Plaintiff has fulfilled the third prong of the *Brunner* test.

## CONCLUSION

Plaintiff cannot afford to meet all of his minimal standard of living expenses. Indeed, he currently is financially dependent upon his parents although he does not foresee them as being a long term solution. He has no disposable income that he can apply toward student loan debt. He has established that there is a likelihood that his health problems will persist into the future and will prohibit him from being able to work full time. He has also made a good-faith effort to repay the student loan debt. As a consequence, Plaintiff has met his burden with respect to establishing that it would be an undue hardship not to except the student loans from discharge. This Court, therefore, holds that the student loans are dischargeable and are discharged. It is hereby ordered that the obligation owing to Defendant, Educational Credit Management Corporation, is discharged pursuant to 11 U.S.C. § 523(a)(8).

An appropriate order shall enter.

## ORDER

For the reasons set forth in this Court's memorandum opinion entered this date,

the student loan obligations of Debtor/Plaintiff, Thomas Francis Barrett, Jr., to Defendant, Educational Credit Management Corporation, is discharged pursuant to 11 U.S.C. § 523(a)(8).

**IT IS SO ORDERED.**