**In re Lisa Phyllis Ann CHENEY, Debtor.**

**Lisa Phyllis Ann Cheney, Plaintiff,**

v.

**Educational Credit Management Corporation, Defendant.**

**Bankruptcy No. 99–01158–M.**
**No. C 02–3036–MWB.**

United States District Court, N.D. Iowa, Central Division.

July 8, 2002.

Christopher C. Foy, Leslie & Collins, Waverly, IA, for appellant.

Robert S. Swanson, Winston, Reuber, Swanson, Byrne, P.C., Mason City, IA, for appellee.

## MEMORANDUM OPINION AND ORDER REGARDING APPEAL OF DECISION OF BANKRUPTCY COURT

BENNETT, Chief Judge.

## TABLE OF CONTENTS

I. INTRODUCTION ...................................................... 651
 A. Procedural Background ......................................... 651
 B. Factual Background ............................................ 651

II. LEGAL ANALYSIS .................................................... 655
 A. Arguments Of The Parties ...................................... 655
 1. ECMC's opening arguments ................................. 655
 2. Cheney's response ........................................ 656
 3. ECMC's reply ............................................. 657
 B. Standard Of Review ........................................... 657
 C. Student Loan Debts And "Undue Hardship" ...................... 658
 1. The controlling statute and the debtor's burden ......... 658
 2. The applicable test for "undue hardship" ................ 659
 D. Application Of The "Undue Hardship" Test ..................... 660
 1. Past, present, and reasonably reliable future financial resources ..... 660
 2. Necessary reasonable living expenses ..................... 662
 3. Other circumstances unique to the particular case ....... 662
 E. Consideration Of The Loans Separately ........................ 666

III. CONCLUSION ....................................................... 666

In this appeal of a decision of the bankruptcy court in an adversary proceeding, a student loan creditor appeals the bankruptcy court's determination that the debtor's two student loans should be discharged, because excepting the loans from discharge would impose an "undue hardship" on the debtor and the debtor's dependents. The student loan creditor not only challenges the bankruptcy court's ultimate conclusion, but several of its factual findings and steps in its analysis. Specifically, the student loan creditor challenges the bankruptcy court's findings regarding the debtor's present and reasonably predictable future income and financial resources; the bankruptcy court's failure to require the debtor to explore options for refinancing her loans, including an income contingent repayment program; its finding that the debtor had made strenuous efforts to maximize her income, in light of her failure to work full-time or to seek larger child support payments from the fathers of her dependents; and its failure to conduct a separate dischargeability analysis as to each of the debtor's two educational loans. The debtor asserts that the bankruptcy court's ruling should be affirmed in all respects.

## I. INTRODUCTION

### A. Procedural Background

Debtor Lisa Phyllis Ann Cheney filed a voluntary petition under Chapter 7 of the Bankruptcy Code on May 6, 1999. She received a discharge in bankruptcy on August 6, 1999. She subsequently filed a complaint on April 2, 2001, seeking a determination that her student loan debts were subject to discharge under 11 U.S.C. § 523(a)(8). The appropriate creditor was ultimately identified as Educational Credit Management Corporation (ECMC) and was substituted as the sole defendant in the adversary action. Following an adversary hearing on March 12, 2002, at which Cheney was the only witness, the bankruptcy judge made an oral ruling that Cheney's student loan debts should be discharged, because excepting them from discharge would impose an "undue hardship" on Cheney and her two children. The bankruptcy judge entered an order pursuant to his oral ruling on March 19, 2002.

ECMC filed a notice of appeal on March 29, 2002. The Clerk of the Bankruptcy Court filed a Certificate on Appeal on May 15, 2002. On May 16, 2002, the Clerk of the District Court entered a notice that the Clerk of the Bankruptcy Court had filed a Certificate of Transmittal of Appellant Election to Proceed Before United States District Court. The Clerk of the Bankruptcy Court then filed an Amended Certificate on Appeal on May 17, 2002, at which time the record on appeal was complete. Pursuant to Bankruptcy Rule 8009 and N.D.Ia.L.R. 8001.1 concerning bankruptcy appeals, appellant ECMC filed its brief on appeal on June 3, 2002, and Cheney filed her responsive brief on June 17, 2002. ECMC then filed a reply brief on June 27, 2002. Therefore, ECMC's appeal is now fully submitted.

### B. Factual Background

Cheney was forty-one at the time of the adversary hearing before the bankruptcy court at issue here, divorced, and living with her two daughters in Manly, Iowa. Cheney's elder daughter, Desirée, is Cheney's daughter by her estranged husband, Dale Cheney. Lisa and Dale Cheney were divorced at some time in the early 1990s. Lisa Cheney's younger daughter, Brook, is her daughter by a boyfriend, Robert Frenz, with whom she lived for a time after Brook's birth.

The record reveals that Cheney incurred the two student loans at issue here in 1989 to finance her education at North Iowa Area Community College (NIACC) in Mason City, Iowa. One loan was in the principal amount of $2,625, and the other was in the principal amount of $4,000. At one point in her brief on appeal, Cheney asserted that, by the time of her bankruptcy petition, her student loan debt had grown to $30,921.68. However, at the adversary hearing, ECMC represented to the court that what is at issue is a debt of $15,662, of which approximately $12,200 is principal and capitalized interest, and the remainder of which is current interest. The difference between the size of the pre-petition debt, as represented by Cheney, and ECMC's representation at the adversary hearing apparently arises from additional interest, penalties, or collection costs, which ECMC is not now seeking to collect. In its reply brief on appeal, ECMC asserts that, "[o]n appeal, the Court should consider the amount of indebtedness at issue to be $15,660.00." Reply Brief of Appellant Educational Credit Management Corporation (ECMC's Reply), 1. This figure is consistent with the bankruptcy judge's conclusion, in his oral ruling, that "the principal and interest, at least, without getting into collection costs is apparently not in heavy dispute. It's approximately $15,662 gross for the two loans." Transcript of Adversary Hearing (Transcript), 114.

In May 1991, Cheney completed a two-year Associate of Arts degree at NIACC in a legal secretary program. However, Cheney only applied for one legal secretary position, for which she was not hired, so she has never worked as a legal secretary. Indeed, the record does not reflect any employment for Cheney until 1993, but Cheney was pregnant with Brook in 1992 and then suffered from postpartum depression and anxiety severe enough to require her hospitalization for a time in 1992.

There appears to be no dispute concerning Cheney's subsequent employment history. After her divorce from Dale Cheney, Cheney worked from 1993 to 1996 for Gerard of Iowa, which she described as a facility for "disturbed children," in a job as a part-time youth counselor and secretary. She testified that she found this job to be "extremely stressful," prompting her to seek other employment. After leaving her job at Gerard of Iowa, Cheney worked for Kelly Temporary Services in 1996 and 1997, and was assigned to a job using a computer system to pay bills for the local Kraft Food facility. However, Cheney was removed from that job by the Kelly Temporary Services representative on site, because, Cheney was told, she "wasn't fast enough." After a period on unemployment compensation, during which Cheney testified that she felt depressed and worthless, she worked for Opportunity Village in 1997 and 1998. Opportunity Village is a residential facility for mentally and physically handicapped persons. Cheney assisted residents with daily activities, meals, and their jobs. Cheney found this job physically and emotionally demanding and testified that it required her to be away from her children many weekends, holidays, and birthdays, even though there appears to be no dispute that the job never entailed more than 32 hours of work a week. Cheney then worked for a few months in 1998 and 1999 at Target as a cashier. Cheney testified that she was led to believe by some supervisors at Target that she was likely to be selected for permanent employment after the holiday season, but she was terminated by another supervisor who, according to Cheney, disliked her and found excuses to terminate her. In 1999, Cheney decided to try being self-employed, first operating a largely unsuccessful snow removal and yard care business,

then, from 2000 to the present, her current house-cleaning business, called Quality Housekeeping Service. Cheney only works about eight or ten hours a week, while her children are at school. However, she has not suffered from the stress or performance problems that she encountered in her prior jobs.

The bankruptcy judge concluded that Cheney's annual income from prior jobs was roughly $10,000 with an earned income credit of as much as $3,500. However, he concluded further that, according to Cheney's income tax records, her annual income from her house-cleaning business in 2000 was $3,546, with an earned income credit of $809, and in 2001 was $3,946, with an earned income credit of $912. Cheney currently charges $13 per hour for her cleaning services, although she originally charged $10 per hour.[1] Cheney submitted about five job applications in the year preceding the adversary hearing, but only one garnered a job offer. That offer was from a Hallmark store, but Cheney ultimately rejected the offer, because it involved a commute of about forty miles, would have interfered with her schedule for existing housekeeping clients, and paid less per hour than her housekeeping work. Cheney received express rejections on some of her applications, but did not follow up on others to which she received no response.

Although Mr. Cheney was originally ordered to pay $360 a month in child support for Desirée, he obtained a reduction in his child support obligation to $230 per month several years ago. Mr. Cheney has had the same employer for several years, but he experienced three periods of unemployment, presumably temporary layoffs, during 2001. Despite those periods of unemployment, Cheney testified that Dale's child support was current at the time of the adversary hearing, although his child support payments had been disrupted during each period of his unemployment until he qualified for unemployment benefits. Cheney has had the assistance of the Child Support Recovery Unit with obtaining child support from Mr. Cheney, but she has never attempted to increase the amount of support she receives from him. She testified that she was just glad to be receiving anything. Mr. Frenz does not pay court-ordered child support for Brook, nor has Cheney ever sought such an order. Cheney testified that she has not sought support from Mr. Frenz, because they were "friends," and because he has voluntarily provided various kinds of support. Specifically, Mr. Frenz has for some time paid Cheney's father $150 per month for a 1992 pickup truck that Cheney is purchasing from her father, interest free, for a total price of $5,500. Mr. Frenz also paid all of Cheney's household expenses for a period during which she was unemployed and has, from time-to-time, paid for needed items for both Brook and Desirée.

In light of the record, the bankruptcy judge estimated that, exclusive of child support or voluntary payments from the fathers of her children and various kinds of public assistance, Cheney's income averages about $405 per month. Cheney receives public assistance with her housing, which reduces her share of her $445 monthly rent to $93. The bankruptcy judge found that Cheney pays approximately $60 per month, on average, for utilities. One of the fathers—the bankruptcy judge concluded that it was not relevant which one—also pays for Cheney's telephone service, so that he can talk to his daughter. Cheney also receives food stamps, but still pays about $75 to $100 of her monthly food costs out of

---

1. Cheney includes the cost of cleaning supplies in her hourly rate, but she estimates that the cost of her cleaning supplies is only about $10 per month.

pocket. The children have qualified for free school lunches. The bankruptcy judge concluded that Cheney pays approximately another $70 per month on necessities not covered by food stamps and another $20 per month to do laundry at a laundromat. Cheney generally buys clothing for her daughters at garage sales, but must occasionally purchase items for school, such as basketball shoes. Her furniture is old and Cheney attempts to hide the poor condition of some of the furniture by covering it with throws. Cheney's transportation expenses, excluding the truck payment made by Mr. Frenz, were found by the bankruptcy judge to be approximately $100 per month, primarily for gasoline, but the bankruptcy judge noted that Cheney had not calculated any expenses for care or repair of the truck, which is now ten years old. Cheney pays about $26 per month for automobile insurance, but has no life insurance. The State of Iowa pays the majority of medical expenses for Cheney and her children through the Medipass program. However, that program requires Cheney to pay certain copays, some of which Cheney simply avoids, for example, by not going to the dentist. The bankruptcy judge accepted Cheney's estimate that she pays only about $2 per month in copays, $1 each for prescriptions for a thyroid medication and an antidepressant. The antidepressant prescription was prompted by another period of depression Cheney suffered after the September 11, 2001, terrorist incident. During that period of depression, lasting several weeks, Cheney cried almost constantly and had difficulty functioning. With the medication, she is now able to function in her housekeeping job and other day-to-day activities. Cheney also pays $75 per month in post-petition debts. The bankruptcy judge found that the only "recreational thing" in Cheney's monthly budget was $42 per month

for cable television. The bankruptcy judge also found that Cheney's self-employment in her housekeeping business "obviated the necessity of child care which is an expensive component even for school-age children." Transcript at 116. The bankruptcy judge concluded that Cheney did not have a "good feel" for her expenses and that her estimates, therefore, were probably low. Ultimately, the bankruptcy judge concluded that Cheney is "living a really minimal standard of living," and that her "expenses are absolutely minimum." Transcript at 123. Indeed, he elsewhere described Cheney as experiencing "a less than minimal standard of living." *Id.* at 126.

Turning to the question of Cheney's future circumstances, the bankruptcy judge considered ECMC's argument that Cheney has earned $10,000 per year gross in the past, which also entitled her to a larger earned income credit, that she could do so with some effort in the future, and that she could obtain or try to obtain more child support from her daughters' fathers. The bankruptcy judge rejected these contentions as too speculative, largely because he concluded that it was impossible to tell whether Cheney would actually be better or worse off if she increased her income or child support, because such increases might reduce her qualification for the public assistance she is currently receiving, which consists of rent subsidies, food stamps, subsidized medical insurance, and free school lunches for her children. He also concluded that Cheney was not going to be a legal secretary, because, "based on her personal makeup," it was not a job that "she would hope [to] do well." Transcript at 123. However, the bankruptcy judge declined to decide the case on the basis that Cheney was not living up to her potential from her Associate of Arts degree. The bankruptcy judge also consid-

ered whether Cheney should be working at a minimum wage job, as follows:

> That's the best historically she's ever done. But it seems to me she hasn't been able to do these well for her own mental health circumstances. I don't think it's necessarily wrong to cho[o]se a job that you can [f]unction at. I don't think it's necessarily against the proof in this—the standard in this case to say she can't clean houses even though she's not working 30 hours a week or 35 hours a week.

Transcript at 123 (obvious typographical errors in transcription corrected).

After reiterating various other aspects of Cheney's circumstances, the bankruptcy judge continued,

> I'm having a problem with the idea that this person is not meeting a standard of living and that [she] is getting aid in order for her to take care of herself and two other children. And that we can look at this and say, but if she only went out and got a better job, she'd be able to pay this student loan off.
>
> In this case, I'm looking at this particular defendant—plaintiff. I'm looking at what her current situation is. I'm looking at her abilities, her fragility if that's what you want to call it. It seems to me that she has been under treatment. I think the evidence supports the idea that she has difficulties with stress and medical problems because of it.
>
> I think I can assess her circumstances and say, I think that this is likely to be the best that she can do for some period of time.

Transcript at 125. The bankruptcy judge's ultimate conclusion was that "[t]he student loans are sufficiently high that I think that having to pay them would be an undue hardship. And therefore, I'm going to grant the complaint to discharge these loans." *Id.* at 126. The bankruptcy judge added, "I think this particular plaintiff is doing the best she can despite the fact that this is less than a full work week, because I think it takes into consideration her medical condition and her personality and her education and her situation." *Id.* at 126–27.

## II. LEGAL ANALYSIS

### A. Arguments Of The Parties

### 1. ECMC's opening arguments

In its opening brief on appeal, ECMC makes several arguments for reversal of the bankruptcy judge's decision, in support of ECMC's contention that this court must instead enter a judgment denying and dismissing Cheney's complaint for discharge of her student loans, or that, in the alternative, this court must make separate determinations under 11 U.S.C. § 523(a)(8) as to each of the two loans at issue, reversing the Bankruptcy Court's judgment with respect to one of the student loan debts. The theme of ECMC's appeal appears to be that "the Bankruptcy Court allowed itself to get caught up in the seeming difficulty of the present situation of the debtor, thereby losing sight of the fact that many of the financial problems debtor faces are the direct result of personal choices she has made," which caused the bankruptcy court to fail to hold Cheney to the applicable burden of proof. *See* Brief of Appellant Educational Credit Management Corporation (ECMC's Brief), 5.

More specifically, ECMC argues that the bankruptcy court's finding concerning Cheney's present and reasonably predictable future income and resources was clearly erroneous. Although ECMC apparently does not dispute the bankruptcy court's finding that Cheney's monthly income, exclusive of child support, is $405, ECMC argues that Cheney's average annual income from 1996 through 1998 was about

$10,000 and that Cheney voluntarily quit two of her better-paying jobs, at Gerard of Iowa and Opportunity Village, because they were unpleasant and caused "stress." ECMC argues that Cheney's assertions of job stress are not credible, because Cheney worked at Gerard for three years prior to leaving. Based on an annual income of $10,000 and earned income credit of $3,500, even excluding additional child support, ECMC contends that Cheney's present and future monthly income capacity "is $1,125, a far cry from that found by the Bankruptcy Court." *Id.* at 6. ECMC argues that this error is magnified as to future income, when one considers Cheney's failure to pursue additional child support from the fathers of her dependents. Because Cheney provided no information concerning Mr. Cheney's and Mr. Frenz's current incomes, ECMC argues that Cheney did not meet her burden of proof to demonstrate that she had maximized her income.

In additional to its principal contentions just above, ECMC argues that the bankruptcy court erred by failing to give adequate weight to Cheney's refusal to consider her options under the William D. Ford Direct Loan Program, including an income contingent repayment plan, which would have refinanced Cheney's student loans, limited her payments to 20% of her "discretionary income," as defined under regulations of the program, and cancelled any unpaid portion of the refinanced debt not paid at the end of the twenty-five year repayment period. ECMC contends that Cheney not only made no effort to learn about options available to her under the William D. Ford Direct Loan Program, she "flatly refused to consider these options," citing Transcript at 81–82. *See* ECMC's Brief at 7.

ECMC also contends that the bankruptcy court failed to make any distinction between the two separate student loans at issue here, instead referring only to the gross amount of the two loans. ECMC contends that applicable law requires the bankruptcy court to apply the undue hardship analysis separately to each student loan. ECMC argues that, in this case, given the relative balances of the two loans, "it is not inconceivable that application of the *Andrews* test might result in denial of discharge with respect to either one of the loans." *Id.* at 8.

The cumulative effect of these errors, ECMC contends, led to an erroneous determination of "undue hardship" and dischargeability of Cheney's student loans.

### 2. Cheney's response

Cheney's argument on appeal is comparatively simple. It is, essentially, that "[c]onsidering the totality of the circumstances of [her] situation, it is a fact that she will never be a legal secretary as that job has too much stress [and][s]he may qualify for minimum wage jobs other than house-cleaning, but that occupation is what suits her situation the best right now." Brief of Appellee Lisa Phyllis Ann Cheney (Cheney's Brief), 4. Cheney likens her situation to that of the debtor in *Meling v. U.S. Department of Education (In re Meling)*, 263 B.R. 275 (Bankr.N.D.Iowa 2001), in that both debtors were hampered with serious mental illnesses likely to persist throughout their lifetimes, which were likely to prevent them from entering the workforce with marketable skills or abilities, and both maintained minimal standards of living with incomes close to the poverty line. Cheney also argues that, in light of the size of the student loan debts, even minimal payments will stretch out for many years, leaving her with no ability to pay off the loans within a reasonable period, as measured against the term of a bankruptcy plan. She also contends that

these circumstances will persist. She contends that she cannot be forced to obtain a higher minimal wage job or to prosecute the fathers of her children, whose current payments, whether court-ordered or voluntary, may be as high as the fathers can now afford.

### 3. ECMC's reply

In its reply, ECMC rejects comparison of Cheney's circumstances to those of the debtor in *In re Meling*, because Cheney does not have a "long and well documented history of mental illness," supported by various diagnoses and testimony of a psychiatrist, but instead self-serving allegations of depression supported by no clinical diagnoses other than postpartum depression and severe anxiety ten years ago. ECMC points out that, since that period of depression, Cheney has not been hospitalized again, and she managed to work for about five years at jobs that she described as "extremely stressful." Thus, ECMC argues that Cheney was able to handle job stress without hospitalization or even consulting mental health professionals. ECMC also argues that Cheney's prescription for Wellbutrin after the events on September 11, 2001, provides no objective evidence of mental illness other than self-serving statements. On the other hand, ECMC points out that Cheney answered an interrogatory on September 20, 2001, indicating that she had no mental disability. Therefore, ECMC reiterates its contention that Cheney's reasonable present and future earning capacity must be found to be $1,125 per month, so that paying her student loan debts does not involve "undue hardship."

### B. Standard Of Review

The Bankruptcy Appellate Panel of the Eighth Circuit Court of Appeals has, on a number of occasions, reiterated the applicable standard of review for bankruptcy appeals in the context of review of determinations of the dischargeability of student loan debts, as follows:

We review the bankruptcy court's conclusions of law de novo and its findings of fact for clear error. *See* Fed. R.Bankr.P. 8013; *Ford v. Student Loan Guarantee Found. of Ark. (In re Ford)*, 269 B.R. 673, 675 (8th Cir. BAP 2001). A determination of undue hardship within the meaning of 11 U.S.C. § 523(a)(8) is a factual determination and is reversible only for clear error. *Svoboda v. Educational Credit Mgmt. Corp. (In re Svoboda)*, 264 B.R. 190, 194 (8th Cir. BAP 2001) (citing *Andresen v. Nebraska Student Loan Program, Inc. (In re Andresen)*, 232 B.R. 127 (8th Cir. BAP 1999)). A finding of fact is clearly erroneous if we are left with a firm and definite conviction that a mistake has been made by the bankruptcy court. *Ford*, 269 B.R. at 675. We may not overturn the bankruptcy court's factual findings merely because we might have decided the issue differently. *Reid v. Checkett & Pauly (In re Reid)*, 197 F.3d 318, 320 (8th Cir.1999). " 'To be clearly erroneous, a decision must strike us as more than just maybe or probably wrong; it must . . . strike us as wrong with the force of a five-week-old, unrefrigerated dead fish.' " *Ford*, 269 B.R. at 675 (quoting *In re Papio Keno Club, Inc.*, 262 F.3d 725, 728 (8th Cir.2001)).

*Long v. Educational Credit Mgmt. Corp. (In re Long)*, 271 B.R. 322, 327–28 (8th Cir. BAP 2002); *Ford v. Student Loan Guarantee Found. of Ark. (In re Ford)*, 269 B.R. 673, 675 (8th Cir. BAP 2001) (stating the standard of review in nearly identical terms); *Svoboda v. Educational Credit Mgmt. Corp. (In re Svoboda)*, 264 B.R. 190, 194 (8th Cir. BAP 2001) (although omitting reference to the "dead fish" standard, otherwise stating a consis-

tent standard of review, clarifying that, "[i]f the bankruptcy court's finding is plausible in light of the entire record, it cannot be clearly erroneous even though the reviewing court may have weighed the evidence differently had it been the trier of fact," and that "'[w]hen there are two permissible views of the evidence, we may not hold that the choice made by the trier of fact was clearly erroneous'") (quoting *Andresen, infra*); *Cline v. Illinois Student Loan Assistance Assoc. (In re Cline)*, 248 B.R. 347, 349 (8th Cir. BAP 2000) (also omitting reference to the "dead fish" standard, but otherwise stating a consistent standard of review); *Andresen v. Nebraska Student Loan Program, Inc. (In re Andresen)*, 232 B.R. 127, 128 (8th Cir.

BAP 1999) (same). Moreover, in *In re Long*, the Bankruptcy Appellate Panel of the Eighth Circuit Court of Appeals declined to revisit this standard of review, at the urging of the present defendant. *See id.* at 328.[2]

### C. Student Loan Debts And "Undue Hardship"

#### 1. The controlling statute and the debtor's burden

■ "Pursuant to Section 523(a)(8) of the Bankruptcy Code [11 U.S.C. § 523(a)(8)], a student loan obligation is excepted from discharge 'unless excepting such debt from discharge ... will impose an undue hardship on the debtor and the

---

**2.** ECMC's failure to cite the decision in *In re Long* in any of the briefing of the present appeal, notwithstanding that ECMC was a party to that case, is inexplicable. The oversight is made still more inexplicable by the fact that ECMC asserted in *In re Long* arguments concerning the debtor's personal or lifestyle "choices" and her failure to avail herself of the William D. Ford Loan Consolidation Program that are similar to arguments ECMC asserts here, and the decision in *In re Long* was handed down on January 10, 2002, several months before ECMC's briefs on the present appeal were due. Although the court notes that ECMC was represented by different counsel in *In re Long*, that hardly justifies the failure of present counsel to cite the *In re Long* decision, because ECMC should certainly have been aware of the decision. Moreover, there are similarities in the circumstances of the debtors in *In re Long* and the present case, as will be noted in the body of this decision, and the Bankruptcy Appellate Panel affirmed the bankruptcy court's discharge of the student loans.

Instead, in the present appeal, ECMC cited *In re Svoboda*, 264 B.R. 190 (8th Cir. BAP 2001), an earlier case also involving ECMC, in which the Bankruptcy Appellate Panel affirmed *denial* of discharge of the student loan debt, but in circumstances that bear little more than superficial resemblance to Cheney's circumstances. In *In re Svoboda*, the debtor was a 38–year–old female, where Che-

ney is 41, she was also divorced, and the principal amount of the student loan debt was comparable ($18,995 versus the $15,662 debt at issue here). *See In re Svoboda*, 264 B.R. at 192. Also, in that case, the debtor had one 3–year–old dependent child, whereas Cheney has two, ages 15 and 10, *see id.*, but that difference probably is not significant. However, the debtor in *In re Svoboda* had a four-year elementary education degree with certification for teaching children with learning disabilities, where Cheney has a two-year secretarial degree; the debtor in *In re Svoboda* had a monthly income in excess of $2,200, or approximately five times Cheney's average monthly income as determined by the bankruptcy court, and also had prospects of salary increases each year and a substantial salary increase upon obtaining her master's degree, circumstances entirely absent in Cheney's case; there was ample evidence that Svoboda's financial situation would improve substantially in the future, where there is no such evidence here; and there was no evidence of any mental or physical condition that was an impediment to Svoboda's employment, as the bankruptcy judge found that there was here. *Id.* at 193–95.

Whether or not ECMC or its counsel inadvertently overlooked the *In re Long* decision or intentionally failed to cite what is clearly governing authority contrary to ECMC's position in the present case, the failure to cite *In re Long* undermines ECMC's present arguments.

debtor's dependents.'" *In re Long,* 271 B.R. at 328 (quoting the statute); *In re Ford,* 269 B.R. at 675 (same); *In re Svoboda,* 264 B.R. at 194 (same); *see also In re Cline,* 248 B.R. at 349 (quoting the pertinent portion of the statute in its entirety); *In re Andresen,* 232 B.R. at 129 (same). The debtor bears the burden of proving "undue hardship" by the preponderance of the evidence. *In re Long,* 271 B.R. at 328; *In re Ford,* 269 B.R. at 675; *In re Svoboda,* 264 B.R. at 194. However, the Bankruptcy Code contains no definition of "undue hardship." *In re Ford,* 269 B.R. at 675; *In re Cline,* 248 B.R. at 349; *In re Andresen,* 232 B.R. at 137. Consequently, "a bankruptcy court must determine if the facts of a particular case warrant a finding that a student loan debt is dischargeable." *In re Ford,* 269 B.R. at 675.

### 2. *The applicable test for "undue hardship"*

In *In re Andresen,* 232 B.R. 127 (8th Cir. BAP 1999), the Bankruptcy Appellate Panel of the Eighth Circuit Court of Appeals was confronted with the question of the proper test for "undue hardship" under § 523(a)(8) for this circuit. The court first looked to the legislative history of § 523(a)(8), but found that it "does not shed light on exactly what Congress meant by use of the term undue hardship," then examined the various tests applied in the federal circuits. *In re Andresen,* 232 B.R. at 137–139. The court then identified the test in this circuit for determining "undue hardship" under § 523(a)(8), as follows:

> The Eighth Circuit Court of Appeals has not expressly adopted or rejected the *Brunner* [test] [*i.e.,* the test proposed and applied in *Brunner v. New York State Higher Education Services Corporation,* 831 F.2d 395, 396 (2d Cir. 1987),] or any other test for undue hardship. However, we think the Eighth

Circuit expressed its preference for a totality of the circumstances test a long time ago in *Andrews v. South Dakota Student Loan Assistance Corp. (In re Andrews),* 661 F.2d 702, 704 (8th Cir. 1981). . . .

The Eighth Circuit's opinion in *Andrews* resulted in a test for undue hardship under § 523(a)(8) that requires an analysis of (1) the debtor's past, present, and reasonably reliable future financial resources; (2) calculation of the debtor's and his dependents' reasonable necessary living expenses; and (3) any other relevant facts and circumstances surrounding that particular bankruptcy case. [*In re Andrews,* 661 F.2d at 704.] The Eighth Circuit's *Andrews* case, while not a finely detailed test as those pronounced in *Brunner* or [*North Dakota State Bd. of Higher Educ. v.] Frech,* [62 B.R. 235, 240–41 (Bankr.D.Minn. 1986)], is the authority in this circuit on the matter of undue hardship discharge under § 523(a)(8).

> Moreover, the *Andrews* test is less restrictive and less narrow, yet it maintains the essential core considerations. For example, the *Frech* test asks whether and to what extent the debtor received benefit from his or her education financed by the loans sought to be discharged. We think that, absent unique circumstances, this inquiry would *ordinarily* be irrelevant. On the other hand, it may speak to a debtor's future earning capacity. The *Brunner* test extends the issue of the debtor's ability to repay to the term of repayment of the loan. We think this limitation may not be appropriate in every case.

*In re Andresen,* 232 B.R. at 139–40 (emphasis in the, original). After examining further various permutations of the "totality of the circumstances" test of "undue

hardship," the court in *In re Andresen* concluded as follows:

> The test for undue hardship binding bankruptcy courts in the Eighth Circuit is that held by the Court of Appeals in *Andrews*. We interpret *Andrews* to require a totality of the circumstances inquiry with special attention to the debtor's current and future financial resources, the debtor's necessary reasonable living expenses for the debtor and the debtor's dependents, and any other circumstances unique to the particular bankruptcy case.

*In re Andresen*, 232 B.R. at 140. Since *In re Andresen* was handed down, the Bankruptcy Appellate Panel of the Eighth Circuit Court of Appeals has consistently applied the test for "undue hardship" as articulated in that case in reliance on *Andrews* in Chapter 7 cases. *See In re Long*, 271 B.R. at 328; *In re Ford*, 269 B.R. at 675–76; *In re Svoboda*, 264 B.R. at 194; *In re Cline*, 248 B.R. at 349.

In the present case, the bankruptcy judge rejected ECMC's contention that the *"Brunner* test" is the test that should be applied in this case, concluding instead that the applicable test in this circuit is the *"Andrews* test," which he outlined by quoting from *In re Andresen*, 232 B.R. at 140. *See* Transcript at 122. In light of the authorities cited just above, which plainly establish that the *"Andrews* test," as articulated in *In re Andresen*, 232 B.R. at 140, is the test of "undue hardship" in this circuit, *see In re Long*, 271 B.R. at 328; *In re Ford*, 269 B.R. at 675–76; *In re Svoboda*, 264 B.R. at 194; *In re Cline*, 248 B.R. at 349, there was no error of law in the bankruptcy court's determination that the *"Brunner* test," on which ECMC relied below, is not the applicable test, and ECMC does not assert on appeal that the bankruptcy judge applied the wrong test. However, as the Bankruptcy Appellate Panel of the Eighth Circuit Court of Appeals also explained in *In re Cline*, "It is not our place to re-evaluate the evidence, especially when the proper legal test was applied." *In re Cline*, 248 B.R. at 350. Thus, not only was there no legal error in the bankruptcy court's choice of the applicable test of "undue hardship," ECMC will be hard-pressed to demonstrate on appeal to this court that the bankruptcy judge's evaluation of the evidence under the proper test was "clearly erroneous." *Id.; see also In re Long*, 271 B.R. at 327–28 (" 'To be clearly erroneous, a decision must strike us as more than just maybe or probably wrong; it must … strike us as wrong with the force of a five-week-old, unrefrigerated dead fish.' ") (quoting *In re Ford*, 269 B.R. at 675, in turn quoting *In re Papio Keno Club, Inc.*, 262 F.3d at 728).

### D. Application Of The "Undue Hardship" Test

#### 1. Past, present, and reasonably reliable future financial resources

In *In re Long*, the court explained that, "[r]egarding the first and second factors [of the *Andrews* test], the debtor should demonstrate that she has 'done everything possible to minimize expenses and maximize income,' and the possibility of changes in the future should also be presented." *In re Long*, 271 B.R. at 328 (quoting *United States Dep't of Educ. v. Rose (In re Rose)*, 227 B.R. 518, 526 n. 11 (W.D.Mo.1998), *aff'd in part, rem'd in part*, 187 F.3d 926 (1999)). ECMC contends—indeed, it appears to be the key fighting issue on ECMC's appeal—that the bankruptcy judge erroneously concluded that Cheney had done everything she could to "maximize her income," because she had voluntarily left higher paying jobs and had made inadequate efforts to obtain a job that would produce more income than her self-employment as a house cleaner. ECMC contends that the evidence

demonstrates that had Cheney "maximized" her income, or attempted to do so in the future, she would have a monthly income exclusive of child support of approximately $1,125 per month, not just $405 per month, as the bankruptcy judge concluded.[3] On appeal, however, this court cannot find that the bankruptcy judge's conclusion on this element of the "Andrews test" was clearly erroneous.

The record supports the bankruptcy judge's finding that Cheney had not simply eschewed better paying employment, but could not reasonably find or maintain such employment, either in the past or in the future. *See In re Cline,* 248 B.R. at 351 ("The court did not let Cline win an undue hardship discharge because she voluntarily limited her earning capacity. Instead, the court found that Cline was unable to maintain a job that paid a higher income."). The bankruptcy judge found that Cheney could not hope to do a job as a legal secretary well, that it seemed to him that Cheney hadn't been able to do even minimum wage jobs well "for her own mental health circumstances," and that he didn't "think it's necessarily wrong to cho[o]se a job that you can [f]unction at," even if it didn't involve full-time work or even 30 or 35 hours of work per week. Transcript at 123. The record amply supports such a conclusion, so that the court smells no "dead fish," robbing this court of any sense (olfactory or otherwise) or any "firm conviction" that "a mistake has been made by the bankruptcy court." *See In re Long,* 271 B.R. at 328; *Ford,* 269 B.R. at 675. At the very least, the bankruptcy court's finding is "plausible in light of the entire record," or is such that there might be "two permissible views of the evidence,"

such that no clear error can be found. *In re Svoboda,* 264 B.R. at 194.

ECMC's attack on the sufficiency of the evidence of the effect of Cheney's mental state on her past and future employment also misses the mark. First, there is no requirement that Cheney put forward evidence of clinical diagnoses of depression or mental disability. In *In re Cline,* the Bankruptcy Appellate Panel of the Eighth Circuit Court of Appeals considered and affirmed comparable findings in support of the debtor's limited past employment and future employment prospects, even if the evidence could have permitted the determination to go either way:

> The bankruptcy court determined that Cline could endure only work that was essentially ministerial and that she suffered from the stress of increased responsibility due to a lack of self-confidence. *While there was no evidence that the debtor was clinically disabled or maladjusted, the bankruptcy court expressly found that Cline was not fit for the higher responsibility and higher paying positions she tried and then left. There is no reason to view the trial court's findings as unreliable merely because no expert evidence was introduced.* The record offers no reason to suggest that the bankruptcy court made its decision without due consideration. The bankruptcy court took evidence, judged the debtor's credibility, and applied the proper totality of the circumstances test. Its finding of undue hardship is not clearly erroneous.

*In re Cline,* 248 B.R. at 350 (emphasis added); *see also In re Long,* 271 B.R. at 329–30 (quoting the same portion of *In re*

---

**3.** The court believes that ECMC's contentions that Cheney could have increased her "income" by seeking more child support from the fathers of her dependents are more properly considered in reference to the third prong of the *"Andrews* test," which considers "other circumstances unique to the particular bankruptcy case," *see, e.g., In re Andresen,* 232 B.R. at 140, rather than here, in reference to past and future "income."

*Cline*). Moreover, in this case, there *is* evidence of persistent mental problems, diagnosed and treated by medical or mental health professionals, consisting of "stress," "depression," and "anxiety," over the last ten years, including a hospitalization in 1992, and the "depression" had recently been sufficiently severe that a doctor prescribed an antidepressant for Cheney. *See In re Long*, 271 B.R. at 330 ("there is some evidence, through Long's testimony that her condition supports a finding that it is unlikely she is going to earn an income sufficient to repay her debt to ECMC," including evidence concerning her mental condition, and "ECMC did not offer any evidence to contradict Long's testimony"). Although ECMC contends that this evidence is only "self-serving" testimony by Cheney, ECMC did nothing to rebut that testimony and the bankruptcy judge properly judged it to be credible. *See In re Cline*, 248 B.R. at 350 (rejecting the creditor's comparable arguments where the bankruptcy judge had judged the credibility of the debtor's testimony about her mental condition); *see also In re Long*, 271 B.R. at 329–30 (relying on *In re Cline* and noting that the creditor, also ECMC in that case, had failed to offer evidence to contradict the debtor's testimony). The fact that Cheney admitted that she did not have a "mental disability" is no admission that her mental state has not impaired her past employment and will not impair her future employment. It is, therefore, inappropriate for this court to second-guess the bankruptcy judge's conclusion that Cheney's "fragility" had limited and would limit her employment, and had impaired and would impair her income. *See In re Cline*, 248 B.R. at 350–51; *accord In re Long*, 271 B.R. at 330. This court must "look for clear error only, and

there is nothing clearly erroneous about the court's ruling in this case" in this regard. *Id.* at 350.

#### 2. *Necessary reasonable living expenses*

As to this second factor in the analysis under *Andrews*, the court in *In re Long* also stated that "the debtor should demonstrate that she has 'done everything possible to minimize expenses....'" *In re Long*, 271 B.R. at 328 (quoting *In re Rose*, 227 B.R. at 526 n. 11). The court does not find that ECMC has ever argued that Cheney's expenses were in any respect excessive. Indeed, such an argument would be plainly fruitless in light of the overwhelming evidence supporting the bankruptcy judge's finding that Cheney is "living a really minimal standard of living," Transcript at 123, or "a less than minimal standard of living," *id.* at 126, and that her "expenses are absolutely minimum." *Id.* at 123. This finding plainly was not "clearly erroneous."

#### 3. *Other circumstances unique to the particular case*

ECMC contends that the bankruptcy judge erred as to three findings that this court finds relate to "other relevant facts or circumstances" of this particular case under the third prong of the "*Andrews* test": (1) findings regarding Cheney's personal or lifestyle "choices" to work less than full-time; (2) findings regarding Cheney's failure to seek additional child support from the fathers of her dependents; and (3) findings regarding Cheney's failure to seek restructuring of her student loan debt. As to these arguments, the decision of the Bankruptcy Appellate Panel in *In re Long* is particularly instructive.[4]

4. For this reason, ECMC's failure to cite *In re Long* in its briefing of this appeal is particularly disturbing.

In *In re Long*, albeit in reference to the *second* rather than the *third* prong of the *Andrews* test, "ECMC assert[ed] that Long has made voluntary lifestyle choices that have adversely affected her capacity to make the $54.00 monthly [income-contingent repayment plan or ICRP] payment, including working only 32 hours per week and nine months per year, sending her child to private school, going to movies, dining out for lunch while at work, and entertaining friends." *In re Long*, 271 B.R. at 331. The Bankruptcy Appellate Panel rejected these arguments, as had the bankruptcy court. The Bankruptcy Appellate Panel noted that "courts generally deny lifestyle choices only when they appear excessive, not because the choices themselves are not economic necessities." *Id.* (citing A. Mechele Dickerson, *Lifestyles of the Not–So–Rich or Famous: The Role of Choice and Sacrifice in Bankruptcy*, 45 Buff.L.Rev. 629, 638 (1997)). The court then concluded that the debtor's "lifestyle choices" were not "excessive," because the debtor "lives modestly, and by living with her parents, she has reduced her living expenses significantly." *Id.* The court concluded, "Upon a review of Long's expenses as a whole, we cannot say that the bankruptcy court clearly erred by not finding some of her expenses to be unreasonable." *Id.* at 331–32.

In Cheney's case, the bankruptcy court's rejection of ECMC's "lifestyle" or "personal" choices arguments was equally justified. Cheney not only lives "modestly," but extraordinarily frugally, in light of the bankruptcy court's conclusion that she maintains what is, at best, a "minimal" standard of living with "minimal" expenses. Moreover, as to her decision to continue in employment that involves only eight or ten hours of work per week in her housekeeping business at $13 per hour, rather than thirty to thirty-five hours per week in a minimum wage job, the bankruptcy court concluded that her choice of employment was not only appropriate, and possibly necessary, in light of her mental condition and situation, but obviated the need 'for daycare for her children, which is a significant expense even if it involves only after school care. Just as in *In re Long*, this court cannot say that the bankruptcy court clearly erred by declining to find that some of Cheney's supposed "lifestyle" or "personal" choices were excessive or unreasonable. *Cf. In re Long*, 271 B.R. at 331–32.

Similarly, this court declines to second-guess or reverse the bankruptcy court's conclusion that Cheney's failure to seek increased child support from the fathers of her dependent children was not an excessive or unreasonable decision. Although Cheney presented no evidence of the current income of either of the fathers nor did she indicate that she had any idea whether their current payments, whether voluntary or court-ordered, were in line with Iowa's child support guidelines, she did present credible evidence that Dale Cheney's employment had been "sporadic," as the bankruptcy court noted, during the last year, even if he had ultimately managed to bring his support current, and evidence that Dale Cheney had promptly sought a reduction of his court-ordered child support from $360 per month to $230 per month after one earlier period of employment. As to Mr. Frenz, Cheney presented evidence that he is voluntarily providing support by paying for Cheney's truck and providing for some of the expenses of both Desirée and Brook, even though only Brook is his daughter. Under the circumstances, the bankruptcy court could properly have credited Cheney's testimony that she was just glad to be getting any support from the fathers without imposing upon her a duty to seek additional support. The bankruptcy court also properly consid-

ered whether any increase in child support from either father might have only a speculative benefit, because of the unknown effect of increased support upon Cheney's public assistance, so that there was no evidence that increased child support would actually improve Cheney's financial situation.

ECMC's contention that the bankruptcy court improperly disregarded Cheney's failure to avail herself of the William D. Ford Direct Loan Program is particularly disturbing for at least two reasons. First, in *In re Long*, the Bankruptcy Appellate Panel rejected similar contentions, and ECMC does not try to distinguish or even mention that holding here. *See In re Long*, 271 B.R. at 332. In *In re Long*, the Bankruptcy Appellate Panel rejected the contention that the debtor would not have suffered undue hardship had she availed herself of the income-contingent repayment plan (ICRP) under the William D. Ford program where "the bankruptcy court determined that [the debtor] would not be able to 'retire or even reduce' her obligation," because "[g]iven the significant amount of the debt, Long's minimal current and future ability to pay against the debt, and the compounding effect of interest on the debt, this determination is not clearly erroneous." *In re Long*, 271 B.R. at 332. The bankruptcy court made very similar findings concerning Cheney's minimal—indeed, nonexistent—ability to pay against the debt. Moreover, in *In re Long*, the court explained,

> Section 523(a)(8) focuses on the burden of the debt itself, and not on the burden of a particular repayment schedule. 11 U.S.C. § 523(a)(8). The bankruptcy court clearly stated that Long's ability to repay the debt to ECMC is unrealistic in light of her other burdens and difficulties. The bankruptcy court considered the ICRP when it considered

the totality of the circumstances, and its determination is not clearly erroneous. *Id.* In Cheney's case, the bankruptcy court also considered Cheney's ability to repay *the debt to ECMC* and also concluded that it was unrealistic in light of her other burdens and difficulties. The bankruptcy court also considered Cheney's counsel's argument that Cheney would not be able to pay even the interest on her present loans, nor would she have any "discretionary income" from which income-contingent payments would be made, so that Cheney would not be able to repay any part of the present student loan debt under any repayment plan. These conclusions are no more erroneous in this case than were similar conclusions in *In re Long*.

The second reason for rejecting ECMC's argument that Cheney should have been required to restructure her debt under the William D. Ford program is what this court can only conclude is a gross misrepresentation by ECMC of the record in support of its argument—and such misrepresentation is perhaps even more disturbing than ECMC's failure to cite and distinguish contrary authority in a case to which ECMC was also a party. ECMC contends that Cheney "flatly refused to consider these options," citing Transcript at 81–82. *See* ECMC's Brief at 7. The cited portion of the transcript consists of the following exchange between ECMC's counsel and Cheney:

> Q. Have you at anytime looked into the options available under the William D. Ford Direct Loan Program?
>
> A. I really don't want to go apply for no loan.
>
> Q. So would your answer be no?
>
> A. No.
>
> Q. Okay. And so you have looked to see whether different repayment options might allow you to take care of your student loan obligations?

A. I'd rather—I just would rather not apply for any—another loan.

Q. Okay. Well, then, I guess you're not interested in seeing whether your student loan obligations, the repayments could be structured differently?

A. No.

Q. No to that. All right.

Transcript at 81–82. No fair reading of the cited portion of the transcript will support a contention that Cheney "refused," flatly or otherwise, to consider the William D. Ford program. Rather, the transcript demonstrates that Cheney had never heard of that program, and it is reasonable to infer that she had not been advised of any kind of "restructuring" of her student loan obligations, or did not understood what "restructuring" might be other than another "loan," which she was understandably reluctant to consider in her circumstances. Had this court been the original trier of fact, the court would certainly have found that counsel abused his superior knowledge of the William D. Ford Program and other alternatives that the debtor knew nothing about, and which counsel made no attempt to explain, in order to elicit a supposed "admission" of refusal to attempt to fix the student loan debt repayment problem.

■ Moreover, the record as shown above is comparable to an exchange regarding the William D. Ford program, and an income-contingent repayment plan under that program, in *In re Long:*

When asked whether Long and her counsel were made aware of the program, [an associate attorney for ECMC] testified:

Yes. I know that your associate had sent me a letter that she had proposed to send to the debtor's counsel informing them, citing them the regulation, giving them the web site where they could have the interactive calculator,

and I made some suggested modifications and approved that to send to the debtor's counsel.

Long testified that she was aware of the possibilities of a plan where she would be considered current on her outstanding student loans by paying $40.00 to $50.00 per month, but she did not apply for the ICRP. When asked why she did not apply, Long testified:

There hasn't been people that were willing to help me through it first of all. Second of all really I've paid on these student loans faithfully for over ten years and I know that on at least one of the loans I've paid even over the principal amount. I never missed a payment. I was faithful on my intentions and everything and then when I needed help with them nobody was helping me. Nobody cared and how can I—how can I let some agency just take a certain amount of money from me at their own will when I'm trying to live without having to live at my parents' house.

*In re Long,* 271 B.R. at 327. Thus, unlike Cheney, the debtor in *In re Long* had at least been made aware of the program, but that debtor encountered a similar complete lack of assistance with it, and, like Cheney, that debtor testified that she could not make even the reduced payment the ICRP might have required. In *In re Long,* the bankruptcy court concluded that the student loan indebtedness would constitute an undue hardship, and the Bankruptcy Appellate Panel affirmed. In this case, affirmance of the bankruptcy court's conclusion that Cheney could not repay her student loan debt is also appropriate, under circumstances reflecting at least as difficult financial circumstances of the debtor and a complete lack of information about or assistance with any program to pay off the loans provided to the debtor by the stu-

dent loan creditor. To put it another way, the William D. Ford Program is no silver bullet for student loan creditors to avoid discharge of student loan debts owing to undue hardship if the creditors fail to advise particular debtors of that or comparable programs and assist the debtors with pursuing them, or demonstrate that a particular debtor did in fact know about and understand such alternatives for resolving student loan debts.

The bankruptcy court in this case did not clearly err in its consideration and disposition of the case in light of the three "unique circumstances" on which ECMC relies on appeal.

### E. Consideration Of The Loans Separately

 Finally, ECMC contends that the bankruptcy court failed to make any distinction between the two separate student loans at issue here, as required by applicable law, instead referring only to the gross amount of the two loans. ECMC argues that, in this case, given the relative balances of the two loans, Cheney could conceivably have been denied discharge with respect to one of her loans, had they been considered separately.[5] ECMC is correct that the Bankruptcy Appellate Panel of the Eighth Circuit Court of Appeals concluded in *In re Andresen*, 232 B.R. 127 (8th Cir. BAP 1999), that the bankruptcy court is required to apply § 523(a)(8) and the "*Andrews* test" to each of the debtor's student loans separately. *See In re Andresen*, 232 B.R. at 137.

However, a fair reading of the record in this case is that the bankruptcy court concluded that Cheney could not pay anything toward her student loans in light of her circumstances, which is sufficient basis to conclude that Cheney had established "undue hardship" as to each of her loans, whether considered separately or together. Moreover, were the court to perform a separate analysis of each of Cheney's loans *de novo*, as ECMC urges the court to do in its alternative prayer for relief from the bankruptcy court's judgment, in light of the present record, this court would not hesitate to find that, even considered separately, undue hardship to Cheney and her dependents would result if either one of her student loans was not discharged.

### III. CONCLUSION

Upon appeal, the court rejects each of ECMC's allegations of error by the bankruptcy court in its determination that Cheney's student loan debt should be discharged owing to "undue hardship." *See* 11 U.S.C. § 523(a)(8). Therefore, the judgment of the bankruptcy court is **affirmed** in its entirety.

### IT IS SO ORDERED.

---

5. ECMC has not pointed the court to any portion of the record demonstrating that ECMC asked the bankruptcy court to consider "undue hardship" as to the two loans separately or argued that there was no "undue hardship" as to one or the other of the loans. Thus, it is not clear that ECMC preserved this purported error. Even assuming it was "plain error" for the bankruptcy court not to consider the loans separately under *In re Andresen*, there was no such error here, where the bankruptcy court's conclusions regarding Cheney's circumstances and ability to pay anything toward her student loan debt more than adequately support a finding that either loan considered separately would still present an "undue hardship."