In re Artur Zbigniew **GOLCZEWSKI,** Debtor.

Artur Zbigniew Golczewski, Plaintiff,

v.

University Accounting Service, ACS, American Education Services, Iowa Student Loan Liquidity, Direct Loans, University of Iowa, and U.S. Department of Education, Defendants.

Bankruptcy No. 04–03119 W.
Adversary No. 05–09052 W.

United States Bankruptcy Court, N.D. Iowa.

July 14, 2006.

Michael C. Dunbar, Dunbar & Dunbar, Waterloo, IA, for Plaintiff.

U.S. Attorney, Cedar Rapids, IA, Iowa Attorney General, Regents & Human Services Division, August B. Landis, Jonathan E. Kramer, Des Moines, IA, for Defendants.

## ORDER RE: DETERMINATION OF DISCHARGEABILITY OF STUDENT LOAN DEBT

PAUL J. KILBURG, Chief Judge.

This matter came before the undersigned on June 15, 2006 for trial on Debtor's Complaint to Determine Dischargeability of Debt. Michael Dunbar appeared for Debtor Artur Zbigniew Golczewski. Lawrence Kudej appeared for Defendant U.S. Department of Education ("DOE"). George Carroll appeared for Defendant University of Iowa. Christopher Foy appeared for Intervenor Educational Credit Management Corporation ("ECM"). Mar-ty Rowlet appeared for Intervenor Texas Guaranteed Student Loan Corporation ("TGSL"). After the presentation of evidence and argument, the Court took the matter under advisement. The time for filing briefs has now passed, and this matter is ready for resolution. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

## STATEMENT OF THE CASE

Debtor seeks to discharge his student loans of approximately $161,000 on the grounds of undue hardship pursuant to 11 U.S.C. § 523(a)(8). Defendants and Intervenors challenge Debtor's claim of undue hardship. The U.S. Department of Education appears for itself and for Direct Loans, a program of the Department. The University of Iowa appears for itself and for University Accounting Service, which manages loans on behalf of the University, but does not itself own any of Debtor's loans. Educational Credit Management Corporation intervened due to its status as successor in interest to American Education Services and Iowa Student Loan Liquidity. Texas Guaranteed Student Loan Corporation intervened due to its status as successor in interest to ACS.

Debtor reached a settlement with the University of Iowa. Debtor agreed that excepting the loans held by the University of Iowa from discharge would not be an undue hardship. Debtor agreed to pay $25 per month towards the loan obligation of $1,200. The University of Iowa agreed to waive interest charges.

## FINDINGS OF FACT

Debtor Artur Golczewski is 46 years old, married with two children, and in good health. His daughter is twelve years old and lives in North Carolina with his former wife. His two-year-old son lives with him and his current wife. Debtor at-

tended the University of Dallas from August 1987 to May 1990, earning a Bachelor's Degree in Art History. (TGSL's Ex. EE at 2.) He attended Virginia Commonwealth University from August 1990 to December 1993, earning a Master's Degree in Art History. (*Id.*) Debtor attended the University of Iowa from August 1995 to December 2001, earning a Ph.D. in Art History. (*Id.*) He began working as an assistant professor at Wichita State University in Fall 2000 while continuing to complete work on his dissertation, which he defended in Fall 2001. He left Wichita State University in 2003 to take a position at the University of Northern Iowa as an Assistant Professor of Art History, where he is currently employed.

Mr. Golczewski's position at the University of Northern Iowa ("UNI") is a six-year tenure track. At this time, he is on probationary status, meaning he has not yet been granted tenure. His most recent evaluation from the Department of Art indicates that he will be employed through the next academic year. (Debtor's Ex. 1 at 3.) It lists several areas where he must improve in order to continue on tenure track. (Debtor's Ex. 2 at 5.) Mr. Golczewski testified that he believed his potential to remain at UNI is "tenuous." He testified that art history jobs are not plentiful. His supervisor expressed concerns about his ability to "make the necessary adjustments to be awarded tenure." (*Id.*) His supervisor then went on to outline a series of expectations that Mr. Golczewski needs to make to continue on the tenure track. (*Id.*) These expectations appear reasonable and include items well within the control of Debtor such as simply using a wireless microphone when teaching in a large classroom, particularly when microphone usage "has been suggested time and again." (*Id.* at 2.) The performance evaluation outlined the many steps the Department of Art had made to guide and mentor Mr. Golczewski.

(*Id.* at 5.) While his supervisor expressed concerns about his willingness to take the necessary steps to improve his job performance, Debtor testified that he intended to do everything he could to remain employed at UNI. Based on Mr. Golczewski's performance, his supervisor recommended his "continued probation with difficulties." (*Id.*)

In the process of completing his thirteen years of higher education, Mr. Golczewski borrowed $113,180 from Defendants or their predecessors. (ECM's Ex. JJ at 1; DOE's Ex. A at 1–4; TGSL's Ex. W at 1–7.) Debtor testified to having made no voluntary payments on these loans in the past six years during which he has worked as a professor. From the Record, it appears Debtor also made no payments during the 19 months when he was out of school between finishing his Master's Degree and entering the doctoral program at the University of Iowa. For some undetermined portion of Debtor's repayment period, some or all of his loans have been granted hardship forbearance. Some of his tax refunds have been garnished by student loan creditors.

Because Debtor has made no voluntary payments on these loans, the accumulated debt has increased by nearly $50,000 over the years. His accumulated student loan debt has grown to approximately $161,000. He owes Educational Credit Management Corporation more than $81,000. (ECM's Ex. JJ at 2.) He owes Direct Loans/U.S. Department of Education more than $66,000. (DOE's Ex. F at 1–22.) He owes Texas Guaranteed Student Loan Corporation more than $14,000. (TGSL's Ex. Z at 1–3.)

Mr. Golczewski currently earns a gross monthly salary of $3,758.89. (DOE's Ex. P at 3.) He is paid on a twelve-month basis for his nine months of work during the

regular school year. (*Id.*) this amount excludes any compensation for summer employment. (Debtor's Dep. 44:23, Oct. 13, 2005.) He was employed over the summer at UNI in 2005, for which he was paid an additional $4,888. (DOE's Ex. P at 1.) Mr. Golczewski testified that he will not have summer employment income from UNI in 2006. His prospects for summer employment from UNI in future years are unknown.

Debtor lists his monthly expenses, including all taxes and payroll deductions, as $3,674.83 on Interrogatory 13. (DOE's Ex. I at 1.) He testified as to the general accuracy of his expenses listed in his responses to Interrogatory 13 and in Schedule J of his petition filing, with exceptions noted in the discussion to follow. Because the list of Debtor's expenses in DOE's Interrogatory 13 is more recent than his Schedule J listing of expenses provided at the time of petition filing, the Court will rely upon this list of expenses as accurate unless other elements of the record conflict. (*See* DOE's Ex. I.) These expenses include $46.86 for federal income taxes. In 2005, Debtor had zero federal income tax liability and received $344 through a refundable additional child tax credit. (DOE's Ex. J at 2.) Mr. Golczewski may only claim his daughter as a dependent in odd-numbered years. (Debtor's Ex. 3 at 3.) He claimed education credits for 2005 that should reasonably continue into 2006 and possibly beyond until his wife completes her education. (DOE's Ex. J at 2.) Thus, Debtor's federal income tax expenses appear reasonable for tax year 2006 with the loss of his ability to claim his daughter as a dependent, but may be overstated for 2007 when he can once again claim her.

Mr. Golczewski pays $294 each month for health and dental insurance coverage for his family. He pays $177 per month towards TIAA–CREF retirement savings. He testified that he was unsure whether his payments towards retirement were mandatory or optional.

Mr. Golczewski's child support obligation is currently $475 per month. (Debtor's Ex. 3 at 3.) His North Carolina child support decree is silent on the termination date for this obligation. *Id.* The North Carolina decree gave full faith and credit to a previous order for child support from Johnson County, Iowa. *Id.* The Johnson County order was not submitted into evidence. Debtor testified that he did not know the termination date for his child support obligation, but assumed that it ended either with his daughter turning eighteen years old or with completion of her higher education. Under either alternative, his support obligation will terminate within approximately 10 years.

Mr. Golczewski's housing and utility costs total $747 per month. (DOE's Ex. I at 1.) Although not binding upon the Court in this particular case, the U.S. Trustee Program's local housing and utilities allowable expense for Debtor's county of residence, Black Hawk County, is $595 per month for a family of three with a mortgage. (DOE's Ex. N at 14 (the expense schedule specifically applies to cases filed on or after February 13, 2006).) In response to DOE's interrogatory, Debtor stated that his house payment was $537. (DOE's Ex. I at 1.) At trial, Debtor testified that his house payment had recently risen to $580 per month. He did not know the cause of the increase. He testified that the payment included homeowner's insurance. Mr. Golczewski's housing contract calls for monthly payments of $436.13. (Debtor's Ex. 4 at 1.) This unverified $43 increase in his housing payments raises issues concerning the accuracy of this expense item.

Debtor purchased his current home on contract. He has an option to purchase the home in December 2006. (Debtor's Ex. 4 at 1.) The home is assessed at $59,600. (DOE's Ex. O at 1.) Debtor testified that he believed his home was not worth the assessed value, but he has never challenged the assessment. Since purchasing the home, Debtor improved his home by replacing the existing windows at a cost of nearly $2,000. (Debtor's Dep. 26:13, Oct. 13, 2005.) Debtor also improved his home by fixing the roof twice and completing "interior work." (*Id.* 25:22–25.) Debtor testified that there was nothing in his house contract that prevented him from selling the house. (*See* Debtor's Ex. 4.) Debtor testified that he believed the equity in his home to be around $5,000, including the improvements he has made. According to Debtor's home purchase contract, the minimum monthly payments are $436.13. (*Id.*) If Debtor only made the minimum monthly payments, his principal balance at the end of three years would be slightly more than $42,000. If he made payments of $537 per month for three years, his principal balance would be slightly more than $38,000. Thus, if Mr. Golczewski chose to sell his home for the assessed value, he might realize from $17,000 to $21,000 or more. While the exact amount is indeterminate, it appears that Debtor possesses an asset worth substantially more than he claims.

Mr. Golczewski lists grocery costs of $600 plus an additional $100 for "meals outside." (DOE's Ex. I at 1.) Debtor's bank statements for the months of December 2005 and January 2006 show ninety-three (93) separate debit card charges at various restaurants for a total of $623.04 in that two-month period. (DOE's Ex. R at 1–15.) He testified that his bank records were typical of his expense patterns. The IRS National Standards for Allowable Living Expenses lists an allowance of $513 for food for a family of three with Debtor's gross income. (DOE's Ex. N at 7.)

Mr. Golczewski's transportation expenses are listed in response to DOE's interrogatory at $200 per month for "car," $65 for car insurance and $80 for gas. (DOE's Ex. I at 1.) At deposition, Debtor could not recall specifically what went into the $200 calculation for "car." (Debtor's Dep. 45:14–47:7, Oct. 13, 2005.) He does not have a monthly car payment. (*Id.* 45:3.) Debtor stated, "maintenance would not amount to [$]200 a month." (*Id.* 46:24–25.) He testified at trial that the amount included the purchase of tires and payment for maintenance, but these are not recurring monthly expenses.

At deposition, Debtor disputed his gas expense, stating that $80 "wouldn't even cover two weeks." (*Id.* 46:9.) Debtor pays for gas using his debit card. (*Id.* 50:15.) Debtor generally buys gas at the same place. (*Id.* 50:25.) Debtor's own bank records indicate approximately $20 per week for gas, with six charges at A & S Petroleum and two charges at Lanternpark Handimart. (DOE's Ex. R at 1–15.) These charges occurred at intervals of seven to nine days each, with one exception where the interval was four days. (*Id.*) The combination of Debtor's answer to the interrogatory plus his bank records are persuasive evidence of his actual expenses for gas at $80 per month, though the Court recognizes an increase because of the increase in gasoline costs.

Mr. Golczewski listed child care expenses of $160 per month in response to DOE's interrogatory. Under deposition, he stated that the child care expenses had doubled. (Debtor's Dep. 23:13, Oct. 13, 2005.) Debtor stated that, "The last check we paid a few days ago was $330." (*Id.* 23:13–14.) His son attends day care from 8:30 am to 1 p.m. five days per week. (*Id.*

23:20–22.) The record does not explain the cause of the child care fees rising one-hundred percent between the time Debtor answered his interrogatory and his deposition. Furthermore, child care expenses for Debtor's two-year-old son should decrease significantly in three years when his son becomes school age. Mr. Golczewski is responsible for half the cost of his daughter's medical expenses, which to this point appear to be primarily for glasses and dental care. (*Id.* 21:12–17.) The record does not reflect the amount of this expense. (*Id.* 23:10; *see also* DOE's Ex. I at 1.) Debtor also lists $80 per month for recreation (or $960 per year) and $45 per month for cable TV. (DOE's Ex. I at 1.)

At trial, Debtor testified to additional expenses. He stated that he sees his daughter twice per year and is court-ordered to pay for her travel expenses. He testified that he spent $2,000 per year for his daughter's travel expenses because each trip costs $1,000. At deposition, Mr. Golczewski stated that his daughter's airline ticket for a December 2005 trip cost $460 plus a $60 fee because his minor daughter was traveling alone. (Debtor's Dep. 22:20–23:3, Oct. 13, 2005.) His deposition testimony based on the actual, specific cost of an airline ticket is the more credible estimation of his daughter's airfare. Thus, Debtor incurs approximately $1,000 per year, or $83.33 per month, for his daughter's airfare to visit him twice each year. He also pays for his daughter's music lessons at $200 per semester. (*Id.* 21:8.) Mr. Golczewski testified that he voluntarily paid for his daughter's music and tennis lessons. (*See also* Debtor's Ex. 3 (child support decree not listing music or tennis lessons as compulsory payments).)

As a professor at UNI, Mr. Golczewski has the opportunity to see significant increases in his income in the coming years. He testified that he expected only increases in his salary tied to inflation. His highest paid colleague in the Art Department who has not yet received tenure is paid a salary of $50,871, more than $6,000 above Debtor's salary of $44,584. (DOE's Ex. S at 1.) His tenured colleagues earn salaries ranging from $54,404 to $79,785. (*Id.*) Debtor testified that, in the event he lost his job at UNI, his employment prospects would be jobs that paid similar to or less than his current salary.

Mr. Golczewski also expects his household income to increase in the future. His wife is currently pursuing a Master's Degree in Accounting from the University of Northern Iowa and anticipates graduating in either 2007 or 2008. Debtor testified that she might not enter the workforce until 2009 in order to study for a period of six months to one year for a C.P.A. license. Thus, in one to three years, Debtor's wife expects to enter the workforce as an accountant. Mr. Golczewski testified that his wife could earn at least $30,000 per year in an entry level accounting position, but she will have student loans of her own to repay. Debtor also testified that his wife speaks English and Russian in addition to her native Lithuanian, but disputed the idea that she could have greater earning potential by utilizing her language skills in combination with her accounting degree. Debtor testified that his wife's income will improve after several years as an accountant.

Although his wife's student loan resources will not be considered in the analysis of Mr. Golczewski's undue hardship complaint, the Court will note that Debtor and his wife utilize student loan proceeds to pay expenses in addition to Debtor's salary. Debtor testified that he and his wife pooled their resources so that his wife's student loan proceeds also paid some of the household expenses. The amount of his wife's contribution is in dis-

pute. Debtor testified at one point that his wife contributed approximately $1,000 from her student loan proceeds after paying for tuition and books. At another point in the hearing, it was suggested that Debtor's wife had testified under deposition to be taking out approximately $10,000 in student loans. Based on their 2005 tax return indicating $4,325 in education expenses, the Golczewski's may have student loan proceeds of approximately $5,700 per year to use towards household expenses. (DOE's Ex. J at 4.) The record does not contain Mrs. Golczewski's deposition testimony or other evidence of her student loan amounts or actual education expenses.

## UNDUE HARDSHIP AND STUDENT LOAN DISCHARGE

■ The Bankruptcy Code excludes most student loans from the list of debt eligible for discharge "unless excepting such debt from discharge under the paragraph will impose an undue hardship on the debtor and the debtor's dependents." 11 U.S.C. § 523(a)(8). The debtor must prove the existence of undue hardship by a preponderance of the evidence. *In re Cheney,* 280 B.R. 648, 659 (N.D.Iowa 2002).

■ Courts have struggled to define "undue hardship" in the absence of a statutory definition. *In re Long,* 322 F.3d 549, 554 (8th Cir.2003). The Eighth Circuit standard for examining undue hardship in the context of discharging student loans is the "totality of the circumstances" test. *In re Reynolds,* 425 F.3d 526, 532 (8th Cir.2005). The test has three factors:

1. the debtor's past, present, and reasonably reliable future financial resources;

2. a calculation of the debtor's and her dependent's reasonable necessary living expenses; and

3. any other relevant facts and circumstances surrounding each particular bankruptcy case.

*Id.*

■ The first factor, concerning debtor's financial resources, "will require a special consideration of the debtor's present employment and financial situation-including assets, expenses, and earnings-along with the prospect of future changes-positive or adverse-in the debtor's financial position." *Id.*

Mr. Golczewski is currently employed as a full-time assistant professor with a monthly gross income of $3,758.89. He will continue his employment into the next academic year, presumably with an increase in salary. Mr. Golczewski has the prospect of summer employment, which would boost his income in future years. Whether Debtor continues into a tenured professorship at UNI or moves on to a position in another institution, his academic credentials and extensive education are reasonably likely to lead to increases in his income in the years to come. Further, Debtor holds a significant asset in the accrued equity in his home. Once his wife completes her education and moves into the workforce, Debtor's household is likely to see a very significant increase in income. Although Mr. Golczewski asserts that his wife will have her own student loan debts, she will not devote the entirety of her after-tax income to the repayment of her student loans in perpetuity. Thus, she is likely to have disposable income of her own which can be devoted to paying a portion of the household expenses now paid entirely from Mr. Golczewski's salary. Once these household expenses are shared between the two incomes, Debtor will have more disposable income which he can devote to retirement of his student loan debts. Further, Debtor's child support obligation will end in the next six to ten

years, freeing up additional funds which may be devoted to paying off his student loans.

For purposes of analyzing Debtor's current financial circumstances, the Court declines to consider Mrs. Golczewski's student loan proceeds because they do not represent actual income into the household. Instead, the student loan proceeds are treated no differently than the flow of funds which may come into a household via credit cards or other credit sources.

■ The second factor, concerning debtor's living expenses, requires a determination of what expenses are "reasonable and necessary." *In re Long*, 292 B.R. 635, 638 (8th Cir. BAP 2003). In this context, "reasonable and necessary" means that such expenses are "modest and commensurate with the debtor's resources." *In re Balm*, 333 B.R. 443, 448 (Bankr.N.D.Iowa 2005). However, so long as expenses are minimal, "debtor is not expected or required to implement every conceivable cost-saving measure." *In re Schulstadt*, 322 B.R. 863, 867 (Bankr.N.D.Iowa 2005).

■ In his response to Interrogatory 13, Mr. Golczewski claimed that his monthly expenses totaled $3,674.83, including taxes and child support. (DOE's Ex. I at 1.) Debtor needs to establish that his living expenses are "reasonable and necessary" by a preponderance of the evidence. His current housing and utilities expenses currently exceed the U.S. Trustee's standard by more than $150 per month. This excess is unreasonable in light of Debtor's outstanding student loan debt and other obligations. The IRS allowance for food costs of $513 is considered reasonable for two healthy adults and a two-year-old toddler. In this context, Debtor's stated food costs of $700 per month are unreasonable and unnecessary, particularly in light of his more than $300 per month expenditures for food outside the home. Mr. Golc-

zewski claimed $200 per month for car expenses without being able to substantiate where those expenses came from. Although Mr. Golczewski will one day have to replace his current car, he will likely have an increased salary and lower expenses at the time of the car's replacement.

■ Debtor's $80 per month in recreation and $45 per month for cable TV are not unreasonable per se, but do not fall within the category of necessary expenses. Further, his voluntary payments for his daughter's music and tennis lessons might be reasonable, but they do not qualify as necessary. The music and tennis lessons were not listed on his response to DOE's interrogatory regarding expenses.

■ Mr. Golczewski's expenses for airfare for his daughter at $1,000 per year is reasonable and necessary for his continued relationship with her. He did not list this expenses on his response to DOE's interrogatory regarding expenses. While Debtor's payments under his decree for his daughter's medical expenses are presumably reasonable and necessary, the lack of an evidentiary record of those expenses remove them from further consideration.

To sum up the Court's findings of Debtor's reasonable and necessary living expenses, the Court begins with Debtor's response to DOE's interrogatory which listed expenses totaling $3,674.83. The Court then subtracts $152 for excess housing costs, $187 for excess food costs, $200 for excess "car" expenses, and $125 for excess recreation and cable TV costs, leaving reasonable and necessary expenses of $3,010.83. The Court then adds back in the unlisted, but reasonable and necessary, cost of airfare for his daughter's twice-yearly trips at $1,000 per year, or $83.33 per month, increasing the reasonable and

necessary expenses to $3,144.16 per month. With gross monthly income of $3,758.89, Debtor has disposable income of approximately $614 per month at present. His disposable income will see a significant increase in the next six to ten years, once his child support obligation terminates. Based on the Court's findings, Mr. Golczewski is likely to see substantial increases in his disposable income in the coming years, which will provide him with still greater resources for paying off his student loan obligations.

 The third factor, concerning relevant facts and circumstances, allows flexibility for the Court to consider a number of factors. These factors include:

1. the debtor's good faith effort to repay the loan, or a debtor's bad faith in non-repayment,

2. whether the debtor has made a good faith effort to obtain employment, maximize income, and minimize expenses, and

3. whether the debtor is suffering truly severe, even uniquely difficult financial circumstances, not merely severe financial difficulty

*In re Schulstadt*, 322 B.R. at 867. "A good faith inquiry may include whether the Debtors caused their own financial condition." *Id.*

 Since Mr. Golczewski has never made a voluntary payment on his student loan debt, the Court cannot conclude that he has made a good faith effort to repay his loans. Debtor's employment record indicates a good faith effort to gain employment and maximize employment. However, his expenses are excessive, particularly in light of his extensive student loan obligations. He has a sufficiently high income that the gap between his income and expenses should be greater than it has been thus far. His financial situation is not truly severe. Mr. Golczewski has disposable income now that he could be devoting to payment of his student loans. His disposable income available to pay off his debts is highly likely to increase in the years to come both from his salary raises and from his wife's entry into the labor force as an accountant.

In considering whether Debtor caused his own financial condition, the Court can look to a number of factors. Debtor failed to make any payments on his student loans in 2005, when his gross income was nearly $5,000 more than his anticipated 2006 income. He has a significant disposable income currently; his 2005 disposable income was even greater when he earned nearly $5,000 extra for summer teaching. Rather than making payments on his student loan obligations, he elected to allow the interest to continue accumulating. If Debtor had chosen to make even modest payments towards his student loans in the six years of full-time employment since he began teaching, his student loan debts would not be as large as they are. Debtor elected to forgo even modest, income-sensitive payments on his student loans. In summary, Debtor allowed the outstanding balance on his student loans to increase by nearly $50,000 because he chose not to make even token voluntary payments on these loans.

 The *Reynolds* court summarized application of the totality of the circumstances test as follows: "Simply put, if the debtor's reasonable future financial resources will sufficiently cover payment of the student loan debt-while still allowing for a minimal standard of living-then the debt should not be discharged." 425 F.3d at 532. Applying this standard, since Mr. Golczewski has sufficient current and future financial resources while maintaining a minimal standard of living, his student loan obligations can not be discharged.

## CONCLUSION

The Court finds Debtor has not meet his burden of proof by a preponderance of the evidence to demonstrate that he would suffer an undue hardship in repaying his student loans. The Court finds that he has sufficient current monthly disposable income to repay the loans and is likely to continue that trend into the future. His lack of good faith effort to repay his student loans further precludes a finding of undue hardship.

**WHEREFORE,** Debtor's Complaint to Determine Dischargeability of Debt is DENIED.

**FURTHER,** a written settlement agreement between Debtor and the University of Iowa is due August 4, 2006.